In re The **HIGHWAY EQUIPMENT COMPANY**, Highlift Equipment Co., U.S. Equipment Co., Debtors.

The **HIGHWAY EQUIPMENT COMPANY**, et al., Plaintiffs,

v.

**ALEXANDER HOWDEN LIMITED**, et al., Defendants.

**Bankruptcy No. 1–85–01667.
Adv. No. 1–90–0037.**

United States Bankruptcy Court, S.D. Ohio, W.D.

April 14, 1993.

See also 120 B.R. 910.

Joseph A. Brunetto, Columbus, OH, for defendants Howden.

John B. Pinney, Charles G. Heyd, Cincinnati, OH, for plaintiffs.

Thomas Noland, Dayton, OH, Liquidating Trustee/co-plaintiff.

John J. Finnigan, Jr., Cincinnati, OH, for co-defendants.

### DECISION ON DEFENDANTS'
### MOTIONS FOR JUDGMENT

BURTON PERLMAN, Chief Judge.

This adversary proceeding arises in a Chapter 11 case pending in this court. In it, the complaining parties make claim against various insurance brokers involved in the procurement of financial guarantee insurance for plaintiff in connection with an equipment sale. (While there are actually plural plaintiffs in the proceeding, we will hereafter refer to "plaintiff" in the singular because the debtor, Highway Equipment Company, is the only effective party.) The instrument executed in the sale was known as the Master Equipment Sales Agreement, hereafter referred to simply as the "MESA Agreement".

The several defendants named in the complaint divide into two groups. One group consists of Alexander and Alexander Services, Inc., Alexander and Alexander, Inc., Alexander Howden, Ltd., Alexander Howden Group Limited, and Colin G. Bird. These defendants will hereafter be referred to collectively as "Howden" or the "Howden defendants". The remaining defendants, Loveless Insurance–Florida, Inc. and Crump, E & S of Atlanta, Inc., comprise a second group and will hereafter be referred

to as "Loveless" or the "Loveless defendants."

This case and proceeding have been referred to this court by the general order of reference of the District Court. This is a non-core proceeding. The parties have, pursuant to 28 U.S.C. § 157(c)(2), consented that the bankruptcy judge hear and determine and enter appropriate orders and judgments, subject to review by appeal.

The proceeding came on for trial. Plaintiff has presented its case, at the conclusion of which defendants have moved for judgment in their favor. Our consideration of these motions is pursuant to F.R.Civ.P. 52(a) and (c), incorporated into bankruptcy practice by Federal Rule of Bankruptcy Procedure 7052. We must consider on these motions whether plaintiff has sustained its burden of proof as to the issues raised by the complaint. F.R.Civ.P. 52(c) advisory committee notes.

The following facts which we find from the evidence presented in plaintiff's case depict the transactions comprising the background for the issues raised by the complaint. Further facts will appear hereafter as we consider the separate claims raised by the complaint.

David Ward was a syndicator with experience in equipment lease tax shelters, residing in Boca Raton, Florida. The Financial Reserve Corporation ("FRC") in which the Morgenstern brothers, Fred, James, and David were principals, and which was engaged in the coal mining business, contacted Ward in the summer of 1981. FRC needed additional mining equipment. Ward was agreeable to putting together a syndicate which would buy mining equipment and lease it to FRC. Ward investigated FRC. He confirmed that, as represented, FRC had received an advantageous contract to supply coal to General Motors Corporation.

Ward formed a limited partnership named Knox Equipment Leasing ("Knox"), including a group of investors as limited partners. Knox was a tax shelter. It was an objective of Knox to have a lease in place by the end of 1981 in order to secure current tax advantage. By summer of 1981, Ward had formed the limited partnership, and had an understanding with FRC, the prospective user of the equipment, but had been unable to find an equipment supplier who would provide mining equipment at a satisfactory price. At this point, he met Bruno Trimpoli who had connections with sellers of heavy equipment. Trimpoli contacted Guy Disotelle of Syracuse Supply, a regional Caterpiller equipment dealer located in Syracuse, New York. Disotelle handled national accounts for Syracuse Supply. Everett C. Brazie was at the time here pertinent, vice president for sales at Syracuse, reporting to the president, Stewart Davis. Syracuse was involved with the deal which Ward was trying to put together during the summer and fall of 1981. The transaction was to involve the purchase of some six million dollars worth of Caterpiller heavy mining equipment.

During the course of consideration of the transaction at Syracuse, a desire that Syracuse be placed in a more secure position than relying entirely upon the contract with Knox, was voiced. In early November, 1981, Trimpoli contributed the thought that a financial guarantee insurance policy might be considered as a vehicle for improving Syracuse's position. Trimpoli knew Laura Leidigh of the Loveless Agency in Atlanta, she at that time being located in a branch office in Tampa, Florida, which she operated as a Loveless vice president. Loveless was a wholesale broker dealing with excess and surplus lines, which in insurance parlance, translates into provision of insurance for unusual risks, not the usual home owners and automobile insurance policies.

Financial guarantee insurance in 1981 was an unfamiliar commodity. Leidigh had had no experience with it. Upon request of Trimpoli, however, she inquired in the U.S. market for coverage of this type, but was unsuccessful in finding an insurance market which would cover the risk. She therefore turned to the London market. The London market, which includes Lloyd's but is bigger than Lloyd's, is a place where risks which are out of the ordinary are routinely handled. Leidigh had not herself

theretofore had any contact with London. Another person in the Loveless agency, Witt, had dealt with London, and put Leidigh in touch with the Howden agency.

Leidigh transmitted to Howden the information she had about the proposed transaction, a description of the equipment, and financial background of FRC and Knox to Howden. Her contacts were initially with broker Steven Rowe at Howden, but she also dealt with Colin Bird, about whom more will be heard later in this opinion. Brazie of Syracuse was also in touch with the people at Howden in the fall of 1981. Howden, after initially failing to find an insurer for the risk, did find one. At first, the insurer was to be Bercanus, a Bermuda company, but subsequently Beacon Insurance Company ("Beacon") was the named insurer. Both Bercanus and Beacon were insurance enterprises of Neill Portermain.

The sales people at Syracuse, Disotelle and Brazie, believed that they had a deal, and a closing was set for November 25, 1981, at the offices of the lawyers for Syracuse Supply in Syracuse, New York. The various parties indeed assembled for the closing in Syracuse, but before documents were executed, the president of Syracuse Supply, Stewart Davis, vetoed the transaction and the closing was aborted.

The sales people at Syracuse Supply were quite disappointed at the loss of this lucrative contract. In an effort to realize some personal benefit, evidently, Brazie contacted Highway Equipment in Cincinnati, saying that he thought that the deal was viable and asked if there was interest in it. Brazie then came to Cincinnati with Trimpoli and proffered the information which Syracuse had. Both Trimpoli and Brazie expected that if the deal were consummated between Highway Equipment and Knox and FRC, there would be remuneration for them.

The scene then shifted to Cincinnati. A remarkable fact in the picture is that while Highway Equipment had not been involved in the transaction prior to the date of the aborted closing at Syracuse on November 25, 1981, nine days later, on December 4, 1981, there was a closing on the MESA agreement, now with Highway Equipment as the seller of equipment. What made this remarkable was that Syracuse had found it necessary to spend months in reviewing the transaction. By the MESA agreement, Highway Equipment was committed to the purchase of six million dollars' worth of construction equipment from Caterpillar which was to be sold to Knox, and leased by Knox to FRC, part of the transaction including a financial guarantee insurance policy (the "MESA policy") with Highway Equipment, the insured, while Beacon was the insurer and Loveless the procuring broker.

Features of the transaction were that Knox was to pay Highway $608,000.00 at the closing, as well as handing two checks in the amount of $121,000.00 and $316,000.00 post-dated December 31, 1981 to Albert J. Norman, president of Highway Equipment. These transfers were made at the closing. The $608,000.00 check was deposited and that payment was received. Norman was informed that the post-dated checks would not be honored on the date appearing on them, and in fact never were honored. There is a dispute about whether Norman was told at the closing or only subsequently that the post-dated checks would not be honored on the date stated on them. A further feature of the transaction was that monthly payments over a 36-month period were to be made beginning in March, 1982. After payments were not received in March and April, 1982, Norman informed Leidigh by letter of these defaults. Leidigh did not transmit these notices to the insurer. There is a dispute about the reason why she did not do this, with Leidigh stating that she was instructed by Norman not to do so, while plaintiff contends that Leidigh did not forward them because to do so would be disadvantageous to Loveless.

In an effort to make the MESA transaction work, negotiations then ensued as a result of which there was a closing on April 22, 1982, at which time a loan was obtained from First National Bank in Cincinnati. A purpose to which the proceeds of that loan was devoted was the curing of the defaults

then outstanding on the part of Knox to Highway. Notwithstanding this remedial action, the transaction continued to fall apart because Knox was not getting paid by FRC, and none of the monthly payments by Knox to Highway Equipment contemplated in the MESA agreement were ever made. Highway Equipment gave notice of default to its insurer, Beacon, in June, 1982. Highway Equipment then proceeded to repossess and liquidate the equipment from FRC, and this process was completed by September, 1982. As far as the claim on the insurance was concerned, Beacon refused to pay the claim, asserting various grounds for its refusal to do so, and litigation between Beacon and Highway Equipment ensued. Before the litigation came to a conclusion, Beacon went into voluntary liquidation. Ultimately, the liquidator of Beacon and Highway Equipment settled the claim of Highway Equipment on account of the MESA policy for $300,000.00. In addition to the receipt of this amount by plaintiff, Highway Equipment recovered not less than $3.9 million on liquidation of repossessed equipment and $1.6 million from the Knox limited partners as guarantors.

The foregoing is truly background for the present litigation, for this litigation is directed at the insurance dimension only, liability being sought to be imposed upon those who procured insurance coverage for the MESA transaction. These were Loveless, the wholesale broker in the U.S. to whom the parties turned to procure financial guarantee coverage, and Howden in the London market, which responded to the efforts by Loveless to find an insurer to provide financial guarantee coverage.

## DISCUSSION

### I.

#### Beacon's Financial Condition

A pivotal question in this case is whether Beacon, at the time Highway's financial guarantee policy was executed, the end of 1981, was insolvent, or at least was in such a financial condition that it could not then pay plaintiff's claim if it were made. This question is important because an insurance broker has some responsibility to his customer about the insurer with whom insurance is placed, and this, of course, is a suit seeking to establish broker liability. The answer to the question comes into play in connection with several counts of the complaint.

█ The best statement of the applicable law appears at Harnett, *Responsibilities of Insurance Agents and Brokers* § 3.15[1] (1991), to the effect that if the insurer becomes insolvent after the policy is written, then there is no liability of the broker unless the factors of insolvency were or should have been reasonably apparent at the inception of the policy. The broker is required to use reasonable care, skill and judgment with a view to the security of the policy procured. We find this to be a fairer statement than that advanced by defendants, to the effect that there flatly is no liability on account of subsequent insolvency of the insurance company after the policy is written.

A central element of plaintiff's case, then, is that Beacon, at the time of the placement of the MESA policy was insolvent or unable to pay claims made against it. This is a pivotal issue in the case, and plaintiff has the burden of proof with respect to it. On this motion for judgment, we test whether plaintiff has carried that burden. After reviewing the trial record, it becomes clear that plaintiff depends almost entirely upon the testimony of Melvin Dillon to sustain that burden. Dillon was appointed Special Deputy Commissioner by the Rehabilitator of Beacon in North Carolina. Dillon agreed to testify on plaintiff's behalf as part of a settlement between Highway Equipment and Beacon. Dillon rendered the opinion that in 1981 Beacon was insolvent and therefore in an unacceptable financial condition.

Defendants objected during the course of the trial to portions of Dillon's testimony. We reserved decision on the objection and now overrule the objection. The court holds that the several grounds of objection advanced by defendants go to the weight

which should be accorded Dillon's testimony, not its admissibility.

The basis for Dillon's opinion of insolvency and precarious financial condition is the fact that it was Beacon's practice to report premiums on its financial statements when received instead of when the risk was written. In his testimony, Dillon said:

Q. What effect did the business [unreceived premiums] have on the asset side to the balance sheet?

A. There would be no cash in because this business had not been paid for. It would show up, presumably under agency balances doing [due] [1] Beacon—owing Beacon. Because this business is over 90 days old, some of it two to three years old, I believe that, in majority, would be disallowed as an asset, it would be a non-admitted asset.

Q. Why is that?

A. Because in the statutory statement regulatory authorities do not admit agency (sic) of balances that are over 90 days old as an asset of the company in determining the financial position of the company.

Q. So what would the effect be of booking business, this business, on Beacon's 1979 annual statement?

A. Using the factors that I've just described that would create an additional liability for the company of $3,700,-000.00, approximately, which when compared or brought down to the surplus line of the company, would give the company a negative surplus and they would be insolvent.

That it was vital to disregard unpaid agency balances over 90 days old in order that Dillon reach his conclusion of statutory insolvency is apparent from the foregoing. On the same point from the cross-examination of Dillon is the following:

Q. One of the factors that really makes the system, as you described it, difficult to work is this rule that you mentioned, that if agents balances are not paid within 90 days, when they are overdue, those premiums are not assets. Indeed, the statutory statement imposes what amounts to a bad debt penalty on the statements, correct?

A. That's correct.

Q. Okay. So that what would happen is if you would sort of recasting the statement, you would add the premium in as an asset, you would set up a liability, and then when you go down to your surplus, you then subject [subtract] out the asset because you're not admitting as an asset, is that correct?

A. That's correct.

Q. And when you subject [subtract] it out, your surplus is obviously going to go down?

A. Yes.

Q. And ultimately, if you do that wish [with] enough of the business you're not going to have any of the surplus left and you're going to be statutorily insolvent?

A. That's correct.

Q. Okay. Now, that purely hypothetical, if this 90 day rule that you mentioned in your testimony the last couple of days, did not apply, just didn't apply and you could take credit for the premium, and you went through this exercise that you went through of adding the premium in, setting up your reserve, I'm not saying you could, but if you could, you would actually inflate the surplus, correct, just as a mathematical proposition?

A. To the extent of the agents balances you would inflate the surplus.

Q. Right. And if you had a lot of overdue premiums you would really inflate the surplus as a mathematical matter, that's all.

A. Yes.

Q. So basically, what you object to the way Mr. Portermain handled his accounting was that he was accounting on a cash basis in effect and not reporting his premium until he actually got it and you say that's wrong, correct?

A. I'm saying that that is incorrect because it did not reflect the proper financial condition of the company.

---

1. Brackets hereafter indicate corrections in the transcript as received.

Yet the reality of a U.S. insurance company accepting risks from the London market is reflected in the following exchange from the cross-examination of Dillon:

Q. Now, is it correct that closing is that point in time when the broker has got the risk fully subscribed to 100 percent, and he has prepared all of the accounting documents and maybe even the policy, and he then goes back to all of the people that underwrote it, and says, "You're bound, here's your percentage." That's the closing, right?

A. Yes.

Q. And he might even, might, even give them a bill at that time, correct? Not a bill, or a receipt or notice of what their premium is going to be?

A. That's correct.

Q. Okay. And then, maybe then, maybe then the broker will prepare the policy, right?

A. Yes.

Q. Okay. And it's not uncommon in the London market for the policy not to be prepared until after the risk is already over, isn't that true?

A. That's correct.

Q. And after the closing, the money begins to flow, right, hopefully?

A. Yes.

Q. Okay. And under London terms, are you familiar with what London terms of credit are, i.e., what London brokers expect in terms of payment?

A. No, I'm not.

Q. Okay. But based on what you've learned, just from your review of the Beacon's accounting records, it wouldn't be surprising to you for the premium not to arrive at the insurer's office for a year in some instances?

A. It's not surprising, no.

Q. Indeed, if you were to sort of try to look at all of the business that the Beacon wrote, its annual business, it might be that in any given year it would only receive on London business, say, 25 percent of the premium they wrote the whole year, in that year?

A. I can't testify as to a percentage.

Q. But it certainly wouldn't be 100 percent?

A. No, I don't believe that it would be.

Q. And based on Miss Pritchard's records, it probably wouldn't even be 50 percent?

A. No.

Q. I'm sorry, based on Miss Bauer's records, it probably wouldn't even be 50 percent, would it?

A. It doesn't appear so.

From all of the foregoing, this court reaches the conclusion that Dillon's opinion that Beacon was insolvent on a statutory basis in 1981 is not acceptable evidence of the financial health of Beacon at that time. Dillon's computations are flawed even in his basic premise of underreporting in 1981 of premiums, but is simply unacceptable when a method is employed which requires exclusion from valuation of a major asset of the company. Dillon's structure is artificial at best, and not a reasonable reflection of reality. The record is clear that the conclusion of insolvency does not follow with respect to the affairs of Beacon in 1981 when generally accepted accounting principles are applied.

We therefore conclude that on the record before us, plaintiff has not proved that in 1981 Beacon was insolvent, or in a precarious financial condition. The first question we raised at the beginning of this section is answered in the negative. This holding affects our conclusion on Counts 1, 2, 9, and 10 of the complaint.

## II.

### Statute of Limitations

■ In addition to Count 14 of the complaint relating to the improper dissolution of Loveless, which will be dealt with separately hereafter, Loveless defendants assert that Highway's other claims, except for Count 9, the breach of contract claim, are barred by the applicable statutes of limitations. Highway does not deny that the statute of limitations has run on these causes of action. Instead, Highway insists that that limitations period no longer ap-

plies pursuant to a settlement with Loveless. In that settlement, Highway voluntarily dismissed its pending action filed in 1990 in state court and re-filed it as a new adversary in this court in 1992. The new adversary complaint named Crump E & S, Loveless' parent and sole shareholder, as a defendant against whom a finding of joint liability on all counts against Loveless is sought. Under the settlement, Loveless and Crump E & S waived their statute of limitations defenses arising under Ohio law, while preserving any available statute of limitations defenses under Florida law. Further, allegations against Laura Leidigh were dropped. The anticipated effect of the settlement from Highway's vantage point was to circumvent the statutes of limitations with respect to their allegations against Loveless (excluding its breach of contract allegation against Loveless, which is not barred pursuant to a fifteen year limitations period according to Ohio Revised Code ("ORC") § 2305.06)) by taking advantage of one of the ORC's saving statutes. ORC § 2305.19 provides in relevant part:

> In an action commenced, or attempted to be commenced, if in due time a judgment for the plaintiff is reversed, or if the plaintiff fails otherwise than on the merits, and the time limited for the commencement of such action at the date of reversal or failure has expired, the plaintiff ... may commence a new action within one year after such date.

A voluntary dismissal, effected in the state court action pursuant to Ohio Civil Rule 41(A)(1), is considered a failure "otherwise than on the merits" in compliance within the meaning of ORC § 2305.19. *Costell v. Toledo Hosp.*, 38 Ohio St.3d 221, 527 N.E.2d 858 (1988); *Frysinger v. Leech*, 32 Ohio St.3d 38, 512 N.E.2d 337 (1987). Thus, Ohio law allows a new action to be filed after a voluntary dismissal within a year from the date of the dismissal. In the present case, the relevant elements of § 2305.19 are met. We hold that the actions grounded in tort and contract filed against Loveless, with the exception of the action under the Florida dissolution statute, are not time-barred. Loveless entered into an arm's length agreement with Highway in which Loveless agreed to waive its statute of limitation defenses arising under ORC Chapter 2305, and Loveless cannot avoid the effect of its agreement.

We proceed now to a discussion of the several counts of the complaint.

### III.

### The Counts of the Complaint

*1. Count 1—Breach of Duty—Howden and Bird.*

In this count, plaintiff alleges that Howden and Bird stood in an agency relationship with plaintiff. As agents, plaintiff says that they had the duty to exercise reasonable skill in procuring a policy, and also had the duty in their relationship with plaintiff to exercise the strictest veracity, candor and good faith, and to refrain from self-dealing and conflicts of interest. As best we can tell from plaintiff's trial memorandum and arguments on the present motion, its contentions as to the first claim are, first, that it was a violation of duty by Howden to place this risk with Beacon, and, second, Howden misled plaintiff with respect to whether there was reinsurance on the policy by Beacon. In its argument, plaintiff also argues that the participation by Howden in a conspiracy, which is the subject of an independent count in the complaint, also constitutes grounds for finding a breach of duty. We are going to defer consideration of that element at this point, and deal with it later in this opinion under the separate claim of conspiracy.

The facts of the case, however, do not support the contention that Howden and Bird stood in an agency relationship with plaintiff. Because Howden and Bird had no contact with plaintiff, plaintiff's allegation of agency depends upon defendant Loveless being an agent for plaintiff. If Loveless was an agent of plaintiff, then it well might follow that Howden and Bird were sub-agents. The whole structure in count 1, then, turns on the initial allegation that Loveless was plaintiff's insurance agent. The evidence does not support this allegation.

The facts as we find them are that the genesis of the MESA transaction was a conversation between Trimpoli, who in the present fact pattern, was an independent deal maker who was looking to find an equipment supplier for Ward, a tax shelter specialist in the field of heavy equipment. Trimpoli contacted Syracuse Supply, a Caterpiller equipment dealer in Syracuse, New York. Syracuse was somewhat skittish of the proposal, and in order to allay their fears, Trimpoli suggested that financial guarantee insurance be obtained. The people at Syracuse thought this desirable, and Trimpoli contacted Laura Leidigh, a broker he knew who worked for Loveless. Trimpoli asked Leidigh to obtain financial guarantee insurance. Through another person at the Loveless agency, Leidigh was introduced to Howden in London by phone, and she, through Howden, located a market for the insurance. That was with Beacon Insurance Company, an American insurer. The evidence at the trial was that in 1981 there was no other source for financial guarantee insurance, for it was a new product at that time.

The Syracuse deal did not close, though the several interested parties gathered for a closing, for the president of Syracuse balked at the very closing itself and declined to close the deal. The scene then shifted to Highway Equipment in Cincinnati, at the instance of an employee of Syracuse who felt that the deal had merit and who also collected a fee from Highway when Highway closed the deal. The deal collapsed in Syracuse on November 24. Thanksgiving was November 26. The closing in Cincinnati occurred December 4, 1980. All that happened is that the deal set up for Syracuse was transported in its entirety to Highway Equipment. The financial guarantee insurance was already arranged. It is true that in the brief period between the Syracuse closing and the Highway Equipment closing, Highway and its attorney directed communications to Leidigh and she responded.

■ On these facts, we hold that there was no agency relationship between Loveless and Highway Equipment. Indeed, it is our conclusion that there was no agency relationship between Loveless and Syracuse Supply. Consequently, Count 1 of the complaint fails, for if there was no agency relationship between Highway Equipment and Loveless, then there was none between Highway Equipment and the Howden defendants and Bird.

It is evidently the position of plaintiff that because there was contact between Leidigh and Highway Equipment, this means that Leidigh occupied the position, relative to Highway Equipment, of a retail broker. In this, plaintiff is mistaken. It is instructional to compare the role occupied by a retail broker such as Arnold Joffe, who testified as an expert at the trial, to that of a wholesale broker. Customers come to a retail broker to meet their insurance needs. He consults with them and advises them as to the course for them to follow. Contrast this to the situation at hand. Loveless is and always has been a wholesale broker. This is distinguished in the insurance industry as a broker who serves retail brokers, helping them to find markets in which to place risks. The mere fact that Leidigh spoke to Norman of Highway Equipment does not change Loveless from a wholesale broker to a retail broker. Further, Trimpoli did not go to Leidigh for advice. He went to her and instructed her to place a financial guarantee insurance policy. This she did. This certainly did not constitute her a fiduciary with respect to Syracuse Supply, let alone with Highway Equipment. *See Damon's Missouri, Inc. v. Davis*, 63 Ohio St.3d 605, 590 N.E.2d 254 (1992).

■ But even assuming *arguendo* that Howden and Bird had agency responsibilities to Highway Equipment, the evidence does not support the allegations that those duties were breached. Plaintiff's position throughout suggests that there were numerous markets which would write financial guarantee insurance in 1981, but defendants improperly directed the placement to Beacon. In fact, there was no other market than Beacon for this risk. Further, plaintiff has failed to establish that placement of the risk with Beacon in 1981 was

ill-advised. The evidence is to the contrary. The only rating authority for insurers at that time, accepted generally by the industry, was Best. Beacon enjoyed an "A" rating from Best at that time. Further, as noted in our discussion above, plaintiff has failed to show that in 1981 Beacon, the insurer on the MESA policy, was not sound financially.

### 2. Count 2—Negligence—Howden and Bird.

■ This count is a variation of Count 1, differing only that claimed liability depends on negligence rather than agency. It depends upon the allegation that Beacon did not have the financial ability to pay a claim if made, and Howden and Bird knew or should have know that. As we have seen, plaintiff has not shown that Beacon's financial condition in 1981 was such that it was unable to pay a claim in the event of a loss. Plaintiff's case in this respect depends entirely upon the testimony of Dillon that Beacon in fact in 1981 was insolvent. We have earlier rejected this contention, for we have found to the contrary, that plaintiff has failed to prove that Beacon in 1981 was in a precarious financial condition. It follows that plaintiff has not established that this fact was known or should have been known to anyone.

### 3. Count 3—Misrepresentation Regarding Reinsurance—Howden and Bird.

The third count of the complaint sounds in fraud. In the count, it is alleged that the stated defendants falsely represented that Beacon would reinsure the risk, it being implied that the risk was not reinsured. It is further alleged that Highway relied on the representation. In the count it is stated that Highway would not have accepted the policy nor would it have entered into the MESA agreement had it not believed the misrepresentation.

The requirements for making out a prima facie case of fraud appear in *Burr v. Stark County Board of Commissioners*, 23 Ohio St.3d 69, 491 N.E.2d 1101, 1105 (1986):

\*   \*   \*   \*   \*   \*

(a) a representation or, where there is a duty to disclose, concealment of a fact,

(b) which is material to the transaction at hand,

(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(d) with the intent of misleading another into relying upon it,

(e) justifiable reliance upon the representation or concealment, and

(f) a resulting injury proximately caused by the reliance.

\*   \*   \*   \*   \*   \*

After considering the pertinent evidence, the court has reached the conclusion that plaintiff has failed to make out a prima facie case of fraud, its case particularly being deficient as to the element of reliance.

The pertinent facts are these. A distinction first must be made between treaty and facultative reinsurance. Insurance companies have ongoing agreements with reinsurers which specify the kind and extent of coverage that the reinsurer will accept without looking at specific transactions. This is called treaty reinsurance. Facultative reinsurance is tailored to a specific risk and is approved by the reinsurer on a case-by-case basis. The evidence showed that Beacon Insurance Company was party to several treaties for reinsurance, but financial guarantee insurance was excluded from that coverage. The evidence further shows that at the date of the closing, December 4, 1981, Beacon had not arranged facultative reinsurance for the MESA risk.

■ Plaintiff's evidence in support of the contention of Count 3, that plaintiff relied upon the existence of reinsurance by Beacon, consists entirely of the testimony of Norman. That is the only evidence that Highway Equipment attached importance to reinsurance of the MESA risk by Beacon, and is the only evidence that except for assurance that there was reinsurance in place for the risk, Highway would not have proceeded with the MESA transaction. Leidigh's testimony is inconsistent with

that of Norman. Leidigh testified that she was asked very casually by Norman about reinsurance of the MESA risk. She testified that she asked Rowe of Howden whether there was reinsurance, and Rowe responded to her that there was, and she passed this along to Norman. This, she testified, was all there was to the statement in her December 3, 1980 letter with respect to reinsurance. As to Rowe, his testimony via deposition was that all he did was refer Leidigh to the reinsurers listed by Best for Beacon. His testimony is consistent with an inference that Rowe was unaware that financial guarantees were not covered by Beacon's treaty reinsurers.

In evaluating the evidence, we note first that though Norman is a fact witness, not only is he being compensated for his services as a witness, but he has an arrangement to share in any recovery which may be obtained by plaintiff in the present case. These matters severely compromise his credibility. Not only is Norman's credibility severely undermined by his interest in the litigation, but in addition he testified in an earlier deposition inconsistently with his testimony at trial with regard to the importance he attached to reinsurance by Beacon. When taxed by defense counsel on cross-examination, he explained the disparity in his deposition and trial testimony by saying that since the deposition his view had been improved by documents and other depositions that he was exposed to in the course of preparation for trial. Norman's testimony at trial, therefore, admittedly is not based upon his recollection, but rather upon documents which he reviewed. While Norman is to be commended for his forthrightness in explaining his inconsistent testimony at trial, the court is left with the belief that his trial testimony was based not on personal knowledge, but was fashioned from documents considered by him to be useful, and was influenced by his self-interest in the litigation.

We accept Leidigh's testimony at trial, that while Norman did inquire of her as to reinsurance by Beacon, the inquiry was perfunctory, and inconsistent with Norman's position at trial that the presence of reinsurance by Beacon on the MESA risk

was essential to the entering into of the transaction between Highway and Knox. Of significance also is the unrebutted testimony by Leidigh that, while Norman asked if there was reinsurance, he did not inquire about who the reinsurers were. We cannot accept an assertion that Highway was deeply concerned about reinsurance, where it gave no thought to the strength of the reinsurers.

Our finding of fact that plaintiff did not rely upon the information it was given with respect to reinsurance in making its decision about whether to enter into the MESA deal on December 4, 1980, is reenforced by the absence of any documentation regarding the importance of reinsurance to Highway. Notwithstanding the short time span before the closing in which Highway was involved in the Knox deal, it did, through its counsel, in writing, state a number of requirements to be met at the closing, and at the closing itself negotiated modifications in the MESA agreement by way of endorsements. Yet in none of the documents is there any reference to a requirement that Beacon reinsure the MESA risk.

We hold that plaintiff has failed to make out a prima facie case of fraud with respect to reinsurance in that there is an absence of evidence of any intent to mislead another, and, most important, there is no evidence of reliance upon the representation by Highway.

4. *Count 4—Unlawful Issuance of MESA policy—Howden and Bird.*

See discussion of Count 12.

5. *Count 7—Fraudulent Conspiracy— Howden, Bird and A & A Services.*

Count 8. RICO Claim—AHIB, A & A Services, and Bird.

Count 7 of the complaint is entitled "Fraudulent Conspiracy—Howden, Bird, and A & A Services". Count 8 is entitled "RICO Claim AHIB, A & A Services, and Bird". We have had some difficulty with plaintiff's position with respect to these two counts, but are left with the impression that plaintiff intends that both counts

be grounded upon the same facts, that Count 8 incorporates the alleged "fraudulent conspiracy" into a federal violation context, by asserting that the fraudulent conspiracy, a "traditional fraud" claim, was perpetrated through the U.S. mails or interstate wires, so that a proper claim under 18 U.S.C. § 1961–1969 arose.

The following facts, which we find from the record, are those bearing on these claims. Neill Portermain was an entrepreneur in the field of insurance. He owned a Bermuda company named Bercanus. In about 1978, Bercanus acquired Northwestern Insurance Company. Bercanus was a subsidiary of United Nebraska Investors, of which Portermain, together with his wife, came to be the sole shareholders. The name of Northwestern Insurance was changed to Beacon.

Portermain resolved that Beacon enter the London insurance market. That market is one where the placement of unusual and high-risk insurance is the norm. In 1978, Portermain met Barry Toomey, a London insurance broker, through a mutual acquaintance, Joseph O'Connor, a New York reinsurance broker. They agreed that a contact office for Beacon, BFG Toomey, would be set up to receive risks in London in which Beacon would be the insurer. Toomey was the resident manager of the agency. Through Toomey, Portermain met Colin Bird, who then was the managing director of the North American division of Howden, an important London market brokerage firm. At its inception, the interests in the Toomey firm were held in the following manner: Portermain–50%, Toomey–25%, Bird–10%, and O'Connor–15%. All stock interests in Toomey were held in the name of a nominee, Southrock, a company owned by Portermain in Bermuda.

The Toomey agency began doing business in late 1978. Bird, through the Howden agency, did direct business to Toomey. Tuckey was an officer, the financial person, at the Toomey agency. During 1982, Bird was given binding authority by Beacon, meaning that Bird had the power to bind Beacon without prior approval of Beacon.

This arrangement was terminated at the end of 1982 because it was not sufficiently productive. In about 1981, difficulties between Toomey and Beacon, meaning Portermain, began to emerge. Toomey was accepting unwise risks on behalf of Beacon and beginning in September, 1981, a large number of risks were prohibited to Toomey by Beacon as a result of dissatisfaction with Toomey by Beacon. The prohibition did not accomplish its purpose, and matters came to a break between Portermain and Toomey, and by letter dated February 10, 1982, Portermain terminated the Toomey relationship. Beacon remained in the London market thereafter through Beacon's own contact office called Beacon International, a UK corporation.

Another figure who must be mentioned in connection with plaintiff's claims of conspiracy is a broker in New York, Peter Polstein, who developed an area of insurance business in which the products liability risks of the members of various trade associations were insured against. Beacon accepted this business.

Beacon, in February, 1984, filed a voluntary petition for rehabilitation in North Carolina.

As we have seen, the MESA policy was placed with Beacon. It is only this that makes the foregoing facts which we have found relevant here. Plaintiff makes them relevant in its claims in Counts 7 and 8 of the complaint, where plaintiff asserts that the insurance brokers for such placement, not only did the placement improperly, but did so in furtherance of a conspiracy, the purpose of which was to defraud insurance customers like Highway Equipment, the fraud contemplated appearing to be the insuring of risks knowing that Beacon would be unable to pay claims if made.

Applicable law may be stated:

A civil conspiracy requires an object to be accomplished, a meeting of minds on the object or course of action, one or more overt acts, and damages as the proximate result thereof.

16 Am.Jur.2d *Conspiracy* § 50 at 268 (1979).

And again:

There can be no conspiracy where the acts complained of, and the means employed in doing the acts, are lawful, and so long as the parties seek only to further their own fair interest, they will not be liable for any merely incidental damage to another.

*Id.* § 49, at 267–68.

An additional applicable statement is:

In this state, conspiracy, in and of itself, furnishes no basis for civil action. A cause of action may arise when damage results from acts committed pursuant to a formed conspiracy.

*Pumphrey v. Quillen,* 102 Ohio App. 173, 141 N.E.2d 675, 679 (1955), *aff'd,* 165 Ohio St. 343, 135 N.E.2d 328 (1956).

Plaintiff's case in respect to Counts 7 and 8 is not presented in terms of the above statements of law. Rather does it appear to be plaintiff's case that a conspiracy and damage are to be inferred from the facts that Bird owned an interest in Toomey; that that interest was held in the name of a nominee, Southrock; that a loan was made to Bird by Toomey; that Portermain kept his records of London transactions (called "T–Records") apart from the other records of Beacon; that these facts prove that a conspiracy for an illicit purpose was in operation, and damage to Highway resulted therefrom.

■ We reframe plaintiff's position in the terms of the applicable law. Plaintiff's position must be that Bird, Toomey, and Portermain had a meeting of the minds; they had an agreement to insure risks at excessive profits; and that such risks would be placed with Beacon which, because the profits were excessive, would be left with inadequate reserves to pay claims. To complete the analysis, it must be plaintiff's position that Highway Equipment was damaged by these acts of the alleged conspirators because Beacon did not pay the claim of Highway Equipment when it was made in June, 1982.

Plaintiff's claim fails because the claimed damage is not shown to be the proximate result of the conspiracy which is alleged. Very specifically, plaintiff has not proved that Beacon could not pay the claim when made. To support its position in this respect, plaintiff depends upon the testimony of Dillon that in 1982 Beacon was insolvent or at least in precarious financial condition. In an earlier section of this decision, we have rejected the sufficiency of the Dillon testimony for that purpose. Beacon went into voluntary liquidation in 1984, and it may be that plaintiff relies upon this fact as probative of the position that Beacon could not pay the claim when made. This record, however, offers no reason to believe that the conditions which led to Beacon's entering liquidation in 1984 were true in 1982. Dillon testified that the reason for entering liquidation was the failure of Beacon's reinsurers in 1984. In addition, Best, the industry rating bible, as we stated earlier, then gave Beacon an "A" rating. Thus, plaintiff's explanation for why the claim of Highway was not paid fails, and with it the notion that damage to Highway was proximately caused by a conspiracy.

Reinforcing the conclusion that any damage to plaintiff was not proximately caused by an alleged conspiracy is the fact that Beacon believed that it had valid defenses to the claim. These defenses were that the insured had failed to disclose material information to the insurer as required by the policy, and that there had been government action which prevented performance. This court is unwilling to make a judgment as to the validity of the those positions, but is aware that when an attorney asserts a legal position, Ohio Civil Rule 11 imposes an obligation on the attorney that he have grounds to reasonably believe that the claim is valid.

We are not willing to conclude that the defenses of Beacon were baseless, the position urged by plaintiff. Plaintiff sought to support its position in this respect by eliciting testimony from Dillon to the effect that the defenses to the claim were invalid. We have serious question whether Dillon was qualified to offer an opinion on this subject. In any case, a contrary opinion was voiced by Katherine Woodruff, Vice–President and legal counsel at Beacon, in her deposition. Her opinion is entitled to at least as much weight as that of Dillon.

In addition to plaintiff's failure to establish that damage was proximately caused by an alleged conspiracy, there is even a question whether it in fact suffered damage by reason of the failure of Beacon to pay plaintiff's claim when made. The litigation between Beacon and plaintiff in the Ohio Common Pleas Court was finally settled. It is true that that occurred after Beacon entered voluntary liquidation and this likely affected the amount of the settlement. We note for the record, however, that the claim was settled ultimately for $300,000.00. While this doubtless was affected by the liquidation proceeding, at the same time it is not an inaccurate reflection of actual damages, taking into account that by that time the equipment in issue had been repossessed and sold, and approximately $3.9 million was recovered by plaintiff on that account. In addition, $1.6 million was recovered from the Knox investors. Taken together, plaintiff has already recovered $5.8 million on its $5.4 million claim.

While we have assumed that there was a conspiracy in the discussion above, there are serious questions about whether there in fact was a conspiracy. The evidence in the record that Toomey insured risks that were unacceptable to Portermain, and that this led to a rupture in the relationship between Toomey and Portermain in 1982 casts doubt on the allegation that there was a meeting of the minds between Bird, Toomey, and Portermain. Further, the record before us establishes that it was common in the London market in 1981 and consistent with the morality of that market at that time, for brokers to have an interest such as Bird's in the Toomey agency. In addition, the fact that a loan was made to Bird by Toomey for the purpose of buying a residence is disarmed by the further evidence that Bird was on occasion dunned for repayment of that loan, and did in fact repay it with interest, and further that Michael Tuckey, an officer of the Toomey agency, also got a loan to buy a residence, and his loan was larger than that made to Bird. Evidently, it was Portermain's practice to reward associates by making such loans available to them. As to plaintiff's

assertion that the T–Records were a second set of books maintained in secrecy by Portermain at his Texas headquarters, the fact is that the T–Records were not a second set of books, but were the books on which Beacon kept its records of its London business.

The second conspiracy alleged by plaintiff, that between Toomey, Bird, and Polstein, relating to trade association business, in our view fares no better. All of the foregoing remarks are equally applicable to the allegations of this conspiracy. Plaintiff bases its contention that this was an illicit conspiracy on the fact that it involved the placement of high-risk insurance in the London market. So far as the record before us is concerned, however, all that was happening with the association business was for "the parties [to] seek only to further their own fair interest." *See* 16 Am.Jur.2d *Conspiracy* § 49, at 267–68 (1979). There is nothing wrong with insuring highrisk business. That indeed is the kind of insurance with which the London market deals as a matter of course. Further, we see nothing to contravene the testimony by Polstein in his deposition that he believed that there was a chance to make a profit from the association programs; that association business could be profitable because claims are not frequent although they may be large; and a sufficient volume of business should support the risk.

We find it for the most part unnecessary to deal with the authorities advanced by the several parties in connection with the RICO claims of conspiracy. There is one exception to that. The case *Holmes v. Securities Investors Protection Corp.*, —— U.S. ——, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), cited by defendant Howden is highly relevant. That case involved an alleged conspiracy to manipulate the stock of various companies, which manipulation resulted in the insolvency of a broker-dealer. Securities Investors Protection Corporation (SIPC), on the basis of subrogation to the rights of customers of the insolvent broker-dealer, brought suit against those who it alleged had caused the insolvency of the broker-dealer. A RICO claim was assert-

ed, but the Supreme Court held that it could not be said that the damages suffered by the customers of the broker-dealer were the proximate result for RICO purposes of the acts alleged by SIPC to have been committed by the defendants.

The court believes that the situation in *Holmes* bears great resemblance to that before us, and we likewise hold that the proximate cause requirement of RICO is not here met, because even if it were found that it was the acts of Portermain, Toomey, and Bird which caused Beacon's insolvency proceeding here, just as in *Holmes*, the injury to Highway Equipment cannot be said to be the proximate result of the acts of the alleged conspirators. Plaintiff attempts to distinguish *Holmes* on the basis that in *Holmes* the insolvency of the broker-dealer could have resulted from any of a number of reasons, while in the case before us the cause of the alleged insolvency was the direct result of the object of the alleged conspiracy. This distinction cannot stand in view of our holding that there was no combination of entities whose purpose was to cause the insolvency of Beacon. We find the cases directly comparable, and we rely on *Holmes* as an additional basis for our conclusion that plaintiff is not entitled to proceed further with regard to its RICO claim.

Furthermore, the Howden defendants assert that the RICO claim is time-barred because Highway's 1990 filing of the claim within the instant adversary failed to satisfy the four-year limitations period imposed on RICO claims. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 155–56, 107 S.Ct. 2759, 2766–67, 97 L.Ed.2d 121 (1987) (applying four-year statute of limitations of 15 U.S.C. § 15(b) of the Sherman Act to RICO actions). Highway responds that the RICO limitations period accrues upon discovery of a factual basis for asserting a RICO claim, and that this did not occur in the present case until Norman learned of the existence of the conspiracy and Bird's secret interest in the Toomey Agency sometime in 1986, less than four years before the filing of the RICO claim. In addition, one of Highway's attorneys contends that he was unaware

that a RICO claim could be made based on the facts of this case until he had a conversation in 1986 with an attorney involved in another action.

The law in the Sixth Circuit regarding accrual of a RICO claim for the purpose of determining when the RICO limitations period begins to run is set forth in *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 241 (6th Cir.1992). In *Agristor*, the court held that "a civil RICO cause of action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *Agristor*, 967 F.2d at 241 (quoting *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Florida, Inc.*, 906 F.2d 1546, 1554–55 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1695, 114 L.Ed.2d 89 (1991)). A "pattern" is defined in 18 U.S.C. § 1961(5) as "at least two acts of racketeering activity [as defined in § 1961(1)], one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... of the commission of a prior act of racketeering activity." A "pattern" does not cover isolated conduct, but rather conduct which has some relationship and a threat of continuity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). An act of racketeering activity pursuant to § 1961(1), in turn, must be one of twenty-four federal crimes and eight state crimes, including mail and wire fraud as asserted herein, punishable by imprisonment for more than one year. Acts of racketeering activity are indictable acts, meaning that a plaintiff pleading a RICO action must allege at least two acts of "racketeering" with enough specificity to show there is probable cause that the crimes were committed. *See Bennett v. E.F. Hutton*, 597 F.Supp. 1547, 1560 (N.D.Ohio 1984). Highway's RICO claim is grounded upon mail and wire fraud. *See Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). Thus, to have timely filed its RICO claim, Highway must have been or should reasonably have been aware, no earlier than 1986

of at least two of Howden's alleged fraudulent acts committed against Highway and that these acts were part of a scheme to defraud Highway.

Despite Highway's argument to the contrary, the record indicates that Highway knew or should reasonably have known of the alleged pattern of racketeering activity comprising its RICO claim before 1986. First, all of the activity upon which Highway bases its RICO claim occurred no later than 1982. Highway first became involved in litigation with Beacon in October of 1982. Further, in February of 1984, Beacon entered into rehabilitation, and soon thereafter, Highway asserted claims arising from Beacon's insolvency in state court against Loveless and Howden. Thus, the alleged fraudulent activity and Highway's alleged injury upon which Highway's RICO claim is grounded was a matter of public record no later than February of 1984—six years before the filing of this adversary.

Furthermore, Highway's assertion that it "discovered" the RICO claim pursuant to discussions occurring in 1986 between one of its attorneys and an attorney involved in another case is without merit. We note that the Sixth Circuit standard for the commencement of the RICO limitations period under *Agristor* contains an objective as well as a subjective component. Thus, even assuming that Highway did not learn of the basis for a conspiracy and RICO claim until March of 1986, as it asserts in its complaint, Highway reasonably should have been aware of the alleged basis for its RICO claim well before 1986. Moreover, the commencement of a limitations period cannot depend on an attorney's awareness of a factual and legal basis for a particular cause of action. *Cf. Jensen v. Snellings,* 636 F.Supp. 1305, 1311 (E.D.La.1986), *rev'd in part on other grounds,* 841 F.2d 600 (5th Cir.1988) (limitations period triggered before client learns from his attorney that cause of action exists). Such a rule would contravene the well-established purposes of statutes of limitation, such as requiring that claims be advanced while the evidence to rebut them is still fresh, and correspond-

ingly, relieving the courts of the burden of trying stale claims when plaintiffs have slept on their rights. *See Burnett v. New York Central R.R.,* 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). We therefore hold that Highway did not timely file its RICO claim.

Highway argues that even if the RICO claim was or should have been discovered more than four years after the applicable RICO limitations period began, its RICO claim should not be barred pursuant to the concept of equitable tolling. Highway cites several cases for the proposition that the doctrine of equitable tolling may prevent claims from being barred by a statute of limitations if the claims were raised in prior actions involved the same parties and the original litigation was still pending. *See Burnett v. New York Central R.R.,* 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965); *Brown v. Crowe,* 963 F.2d 895 (6th Cir.1992); *Farrell v. Automobile Club of Michigan,* 870 F.2d 1129 (6th Cir.1989); *Emrich v. Touche Ross & Co.,* 846 F.2d 1190 (9th Cir.1988); *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 616 F.2d 394 (9th Cir.1980), *cert. denied,* 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980).

All of the foregoing cases are distinguishable from the instant case. *Burnett, Farrell* and *Mt. Hood Stages* all were cases in which the limitations periods were tolled because the lawsuits were either identical or asserted the same causes of action as prior litigation which was still pending when the later actions were filed. Further, *Brown v. Crowe* is inapposite here. In that case, the court found that the statute of limitations in a Title VII civil rights claim was tolled because the tardiness of the claim was attributable to bureaucratic confusion rather than to conduct on the part of the plaintiff. *Brown,* 963 F.2d at 898. That case is easily distinguishable from our case, in that all responsibility for filing the RICO claim lay with Highway, and Highway's diligence was in no way impeded by the delay of a bureaucratic agency. Finally, *Emrich v. Touche Ross & Co.* does little to inform our inquiry, since the Ninth Circuit remanded that

case to the district court for a determination of whether the statute of limitations regarding a RICO claim was tolled pursuant to federal tolling doctrines. *Emrich*, 846 F.2d at 1199.

In sum, none of the exigencies that might justify tolling of the limitations period for Highway's RICO claim, such as the pendency of related proceedings in other fora, are present here. Further, this is not a case in which other traditional justifications of limitations tolling might be invoked, such as the inability of a plaintiff to bring suit, or a defendant's fraudulent concealment of a fraudulent cause of action against him. *See* 51 Am.Jur.2d *Limitation of Actions* § 139, at 710 (1970). We therefore conclude that the RICO claim is time-barred.

### 6. *Count 9. Breach of Contract—Loveless.*

In this count, plaintiff asserts liability of Loveless for breach of duty as an agent, it being specifically alleged that the agency relationship was created by a written contract. We find as a fact that there was no written contract as alleged. Relief on this count is denied on the basis of the discussion above of Count 1.

### 7. *Count 10. Negligence—Loveless.*

The discussion above of Count 2 is equally applicable here, and relief on this count is also denied.

### 8. *Count 11. Misrepresentation on Reinsurance—Loveless.*

The discussion above of Count 3 is equally applicable here, and relief on this count is also denied.

### 9. *Count 12. Unlawful Issuance of MESA Policy—Loveless.*

In this count, plaintiff asserts Loveless's liability essentially for violation of Ohio Revised Code § 3905.31, which prohibits persons not holding an Ohio surplus line broker's license pursuant to ORC § 3905.-30, from taking or receiving "any application for such insurance upon property or persons in this state." The allegations in Count 12 also include requirements from ORC § 3905.33, which provides for the filing of an affidavit by a licensed Ohio surplus line broker when surplus insurance is placed.

Concededly, Loveless was not an authorized Ohio surplus line broker as required by ORC § 3905.30, nor was the affidavit required by ORC § 3905.33 filed. Plaintiff contends that by reason of these failures, Loveless is liable for the damages allegedly suffered by plaintiff.

■ With regard to this count, there is a fundamental issue of law. Loveless calls our attention to ORC § 3905.99, Penalties, which provides, in pertinent part:

\*       \*       \*

(B) Whoever violates § 3905.31 or § 3905.33 of the Revised Code, shall be fined not less than twenty-five nor more than five hundred dollars or imprisoned not more than one year, or both.

Loveless asserts that this is the exclusive remedy for violations of ORC § 3905.31 or § 3905.33, and no private right of action may be predicated upon violations of those statutory sections. Plaintiff asserts that this position is incorrect, for the statutes in question "are meant to protect the public" and therefore private actions in the nature of strict liability or negligence per se may be founded upon such violations.

The following at 1 Am.Jur.2d *Actions* § 73 at 601 (1962) is helpful in resolving this question:

[T]his depends upon intent to impose liability, whether the statute purports merely to secure the safety or welfare of the public generally, or the duty prescribed for the benefit of an individual specially injured by its violation.

It seems clear to us that the present statute is in the first category, and consequently a private cause of action cannot be predicated upon it, particularly where the statute itself prescribes a remedy for violation. A definitive interpretive statement is to be found at 85 O.Jur.3d *Statutes* § 360 at 393 (1988):

Where a statute creates a new right or imposes a new duty, and prescribes a remedy for its violation, the remedy thus prescribed is exclusive.

The situation before us falls squarely within that language. The court therefore concludes that no private action may be predicated upon the acts presently complained of.

██ But even if plaintiff could pursue a private action here, we are constrained to hold that it is estopped from doing so. The MESA policy itself states that it is delivered to Highway at a Pennsylvania address, not an Ohio address. At the trial, there was testimony by both Norman and Leidigh as to the circumstances which led to this recitation. Each testified independently that it was believed (rightly or wrongly) that recitation of an Ohio address would lead to the imposition of a substantial tax which could be avoided by listing a Pennsylvania address. In order to avoid imposition of the Ohio tax, Norman furnished a Highway lockbox address in Pennsylvania and it was that which was used in the policy. We hold that by its actions in attempting to avoid Ohio law, plaintiff may not assert a claim based upon Ohio statutes relating to insurance.

### 10. Count 14. Liability of Parent Shareholder—Crump.

In Count 14 of the Complaint, Highway alleges that Crump–Loveless, Inc. ("Crump") was Loveless' parent and sole shareholder, and, as such, received all of Loveless' assets upon Loveless' dissolution. Highway avers that Crump and Loveless failed to comply with § 607.261 of the Florida General Corporation Act in that they failed to give notice of Loveless' dissolution to Highway and other creditors before the filing of Florida's dissolution on September 6, 1985. Highway further alleges that Loveless and Crump violated the Florida dissolution statute by failing to provide adequately for the satisfaction of Highway's claims, and falsely certified that the same had been done in Articles of Dissolution filed with the Florida Secretary of State.

Section 607.261 of the Florida General Corporation Act, applicable at the time of the Loveless dissolution, was entitled "Procedure before filing articles of dissolution" and provided in relevant part:

Before filing articles of dissolution and after the vote authorizing dissolution:

.        .        .        .        .

(2) The corporation shall immediately cause notice [of the impending dissolution] to be mailed to each known creditor of, and claimant against, the corporation.

(3) The corporation shall proceed to collect its assets, convey and dispose of such of its properties as are not be distributed in kind to its shareholders, pay, satisfy, or discharge its liabilities and obligations or make adequate provision for payment and discharge thereof, and do all other acts required to liquidate its business and affairs. After paying or discharging all its obligations or making adequate provision for payment and discharge thereof, the corporation shall then distribute the remainder of its assets, either in cash or in kind, among its shareholders according to their respective rights and interests.

Highway asserts that in addition to failing to provide the required notice of dissolution to its creditors, Loveless failed to provide adequately for Highway's claim against it by setting aside $80,000.00—an amount Highway states was patently insufficient to cover its claim. Further, avers Highway, Crump is unable to account for that sum.

It is not necessary to resolve the factual question surrounding the net worth of Loveless when it was dissolved, for we find that this count of the claim is time-barred pursuant to the Florida dissolution statute that was valid when the dissolution occurred. Section 607.297 of the Florida General Corporation Act was entitled "Survival of remedy after dissolution." It provides:

The dissolution of a corporation either:

(3) By expiration of its period of duration shall not take away or impair any remedy available to or against such corporation or its directors, officers, or shareholders for any right or claim existing, or any liability incurred, prior to such dissolution if action or other pro-

ceeding thereon is commenced within 3 years after the date of such dissolution.[2] It is undisputed that Loveless was dissolved in 1985, and that Highway did not file this action against Loveless and Crump until 1990, well after the three year limitations period for suits against dissolved corporations applicable herein.

We reject Highway's argument that Ohio statute of limitations law, which Highway asserts allows actions against dissolved corporations to be filed indefinitely, should apply here. While Ohio conflict of law rules do apply here, the three-year limitations period of the repealed Florida statute controls, for where a statute of a foreign state creating a cause of action also fixes a limitations period for that cause of action, the limitations period is to be regarded as substantive law of the cause of action and controls such an action brought in a sister state. *See* 16 O.Jur.3d *Conflict of Laws* § 52, at 104–05 (1979). Thus, since the Florida dissolution statute fixed a limitations period, that limitation period shall apply to this Ohio cause of action. This view is consistent with other, well-established authority. *See, e.g.,* 66 O.Jur.3d *Limitations and Laches* § 21, at 155 (1986) (where right of action arising under a statute did not exist at common law, the time fixed by a limitations period under that statute will control); 51 Am. Jur.2d *Limitations of Actions* § 68, at 648 (1970) (same).

Further, in rejecting Highway's statute of limitations argument, we observe that the case Highway cited in support of its argument that the limitations law of the location of the claim controls, *Advance Machine Co. v. Berry*, 378 So.2d 26, 27 (Fla. App.1980), *cert. denied,* 389 So.2d 1107 (Fla.1980), is neither controlling nor persuasive here. In that case, the court held that the three year limitations period of the Florida dissolution statute applied in connection with a tort claim filed against a dissolved, foreign corporation. *Advance Machine,* 378 So.2d at 27. The emphasis of

that case, however, was on the fact that Florida dissolution law applied because foreign corporations doing business in Florida, and thus availing themselves of the accompanying benefits, should not be allowed to escape the effects of tortious conduct pursuant to a shorter limitations period offered by that corporation's home forum. *See id.* In fact, the *Advance Machine* court did not expressly find that the limitations law of the place in which the claim arose is controlling. We also do not infer that as a general proposition of law from our reading of that case.

Thus, in light of the foregoing authority, we hold that the claim by Highway against Crump arising out of Loveless' dissolution is time-barred.

\* \* \*

We do not separately discuss Counts 5, 6, and 13 of the complaint because they are dependent claims and would come into play only upon a holding of liability in other counts.

Defendants' motions for judgment will be granted and the complaint dismissed.

---

**2.** The former Chapter 607 of the Florida General Corporation Act, which included the sections relating to the dissolution of corporations, was repealed and replaced by a new Chapter 607 effective July 1, 1990. Fla.Stat.Ann. Ch. 607

(Historical Notes) West (1993). Neither Loveless or Highway, however, disputes that the former Chapter 607 applies here, since it was valid at the time of the Loveless dissolution.