SECOND DIVISION

March 31, 2005

Nos. 1-03-3712, 1-03-3763 

(Consolidated)

AYH HOLDINGS, INC., 

Plaintiff-Appellant, 

v.

AVRECO, INC.,

Defendant-Appellee,

and

GREMESCO, INC.,

Defendant.

AYH HOLDINGS, INC.,

Plaintiff,

v.

GREMESCO, INC.,

Defendant-Appellant,

and

AVRECO, INC.,

Defendant-Appellee.

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the 

Circuit Court of

Cook County.

Honorable

Ronald F. Bartkowicz, 

Judge Presiding.

PRESIDING JUSTICE BURKE delivered the opinion of the court:

Plaintiff AYH Holdings, Inc. appeals from an order of the circuit court granting summary judgment in favor of defendant Avreco, Inc. on AYH's claims for breach of fiduciary duty and professional negligence against Avreco.  Defendant Gremesco, Inc. also appeals from an order of the circuit court granting summary judgment in favor of Avreco on Gremesco's cross-claim based on contribution and indemnification against Avreco.  On appeal, AYH contends that the trial court erred in finding that Avreco owed no duty to it and in granting summary judgment in favor of Avreco.  Gremesco, too, contends that the trial court erred in finding that Avreco owed no duty to AYH and in granting summary judgment in favor of Avreco.  For the reasons set forth below, we reverse and remand.

STATEMENT OF FACTS

This appeal arose out of the procurement of insurance intended to provide excess property and business-interruption coverage to American Yacht Harbor Associates L.P. (AYH).
(footnote: 1)  AYH owned and operated commercial property, including a marina, on the United States Virgin Island of St. Thomas.  The property sustained severe damage when Hurricane Marilyn struck on September 15, 1995.  The insurance carrier, Geneva Assurance Syndicated, Inc. (Geneva), from which a policy of excess insurance was procured, subsequently became insolvent and failed to cover AYH’s losses.  

Geneva was an insurance syndicate that conducted business through the Illinois Insurance Exchange (Exchange).  The Exchange was a surplus lines market, structured similar to Lloyds of London, and the board of trustees, which governed the Exchange, was made up of public individuals and syndicate representatives.  Only an Exchange broker could procure and process insurance through an Exchange syndicate.  As a result of being unable to collect for its losses, AYH filed this lawsuit against Avreco and Gremesco, insurance brokers involved in placing the policy with Geneva.  Gremesco filed a counterclaim against Avreco based on contribution and indemnification.  

Prior to 1989, AYH insured its property through Lloyds.  However, following Hurricane Hugo in 1989, Lloyds withdrew from the Caribbean.  Thereafter, AYH placed its insurance with Geneva.  According to AYH’s complaint, between 1992 and 1995, AYH, by John Jelilian, used VI Insco, a Virgin Island’s insurance brokerage firm, through Richard Child, and Gremesco, a surplus lines wholesale broker, through Chris Larson, to secure insurance from Geneva, through underwriter John Brotsos.  When AYH first began using Geneva, AYH and its creditor, Barclays, were advised by Stan Dawson, of VI Insco, that Geneva did not have a Best rating.  However, Dawson expressed to AYH his understanding that the lack of a Best rating did not matter because policies procured through the Exchange were covered by the Exchange’s guaranty fund.  Prior to October 1994, insurance was placed by Gremesco through an exchange broker subsidiary of Geneva.  When the subsidiary ceased operations, Brotsos, of Geneva, advised Larson, of Gremesco, to go through Frank Prestipino, a broker with Avreco, to place the renewal coverage.  There is no dispute that at all relevant times there was no contact between anyone at AYH and anyone at Avreco.

With respect to the 1995 renewal at issue here, the third or fourth renewal with Geneva, although VI Insco was AYH’s agent since AYH was required to have an agent on the island, it played a very minimal role in placing the coverage because Jelilian worked directly with Larson.  On March 11, Gremesco prepared a "Commercial Insurance Application" for the renewal, which was forwarded to Avreco as well as a competitor broker, Theodore Tunick.  According to Larson, Avreco was to take this information and work with Geneva to procure coverage.  On March 13, Larson wrote to Prestipino, including AYH’s renewal information and advising him that AYH was seeking quotes from at least one other broker.  Larson wrote, "Thus, we are not working in a vacuum.  As such, I may need you to impress upon our pal [Brotsos] the need to be flexible as respects pricing and possibly the structure of the renewal."  Additionally, Larson wrote: "The Controller [of AYH] has advised that he is striking an overall package number of $180,000 this year.  This means I'd have to come in around $235,000 for the liability and $245,000 for the property at full limits.  Realistically, I'd need J.B. [Brotsos] to come in around $100,000 or so for his portion to layer the thing to ultimately achieve a [$]410,000,000 or thereabouts."  According to Prestipino, he agreed only to act as a "conduit" and "a funnel" for the paperwork between Larson and Brotsos.

On April 8, Larson wrote to Brotsos, advising him that Tunick was quoting against Geneva and had pointed out that Geneva was not rated.  Larson advised Brotsos that he would give AYH both quotes, but would recommend the most economical.  Additionally, Larson wrote, "Tunick poses a serious threat so your best efforts *** will be greatly appreciated."  On April 19, Tunick submitted its quote to Jelilian, noting it obtained quotes from only A rated companies.  Tunick detailed its policy in comparison with Geneva’s, including the difference in premiums; his being shown as ultimately less.  Nonetheless, on April 26, Larson wrote to Prestipino, instructing him to bind the excess coverage quote provided by Geneva.  The next day, Avreco forwarded an "evidence of insurance" to Larson.  The policy was not ultimately issued until October 19.  The "Declaration" page identified Avreco as the Exchange broker for the policy.  As noted above, on September 15, AYH sustained extensive damage and submitted it claims to Geneva, which did not pay.  

On May 18, 1998, AYH filed the instant lawsuit against Avreco and Gremesco, alleging that they breached their professional and fiduciary duties owed to AYH because they failed to monitor and discover the unsound financial condition of Geneva and failed to maintain a reasonably adequate market security monitoring system.  AYH alleged that had the brokers not breached their duties, coverage would have been placed with a financially stable company and AYH would have been paid its losses.  Count I set forth a breach of fiduciary claim against Avreco and Gremesco, count II set forth a professional negligence claim against each, and count III set forth a breach of contract claim against each.  Thereafter, Avreco and Gremesco filed motions to dismiss, arguing that AYH’s complaint failed to state a cause of action.
(footnote: 2)  These motions were subsequently denied and Avreco and Gremesco answered AYH’s complaint and set forth affirmative defenses. 

On August 19, 2002, Avreco filed its motion for summary judgment and brief in support of same, arguing that AYH's claims were barred by the statute of limitations, another Illinois statute, the duties alleged were nonexistent, and there was no agency relationship between AYH and Avreco.  Thereafter, Gremesco filed a motion for summary judgment on the same grounds.  AYH responded in opposition and Avreco and Gremesco replied.  

Extensive evidence, both through depositions and documentation, was presented in connection with the motions for summary judgment.  On May 12, 1995, the Exchange issued a press release in connection with Geneva’s financial condition, particularly that its "capital structure could be inadequate to support its underwriting activity."  The press release stated that Geneva and the Exchange had reached an agreement under which Geneva voluntarily agreed to cease writing business pending a complete financial analysis, to file its 1994 audits by June 1, and to submit a 90-day business plan as to how it would restructure its assets.  The Exchange further stated that it was "confident the analysis of Geneva's financial structure and any subsequent restructuring will result in providing policyholders a stronger syndicate within the group."  According to numerous witnesses, this press release was disseminated to all syndicate owners and Exchange brokers, including Avreco.

Sometime shortly after this, Gremesco was advised of the situation.  According to Jelilian, he sent a fax to Larson, in approximately the third week of May, regarding information he had received from Tunick that Geneva was no longer writing insurance.  Jelilian inquired of Larson as to the significance of Geneva’s cessation of writing insurance.  Within a couple of days, Larson responded to Jelilian and advised him of what he had learned from Brotsos and Prestipino.  Jelilian was led to believe that the cessation was temporary and there were no immediate concerns or problems.  Jelilian further testified it was his understanding that Carl Freyer, an owner of AYH, spoke with Dick Cross from Barclays about the situation and was also told there was no problem. 

Larson testified that he first became aware of the May 12 press release and Geneva's financial difficulties when he learned same from Jelilian.  According to Larson, he was surprised and embarrassed to learn this information from Jelilian because he would have expected to have heard it from Avreco or Geneva.  Larson told Jelilian he would check into the matter and, thereafter, spoke with Prestipino and Brotsos.  A couple of days later, when Jelilian and Child were present in Larson's office, he had separate conference calls with Brotsos and Prestipino because he wanted Jelilian and Child to hear directly from them what was transpiring.  With respect to the conversations, Larson testified that the substance of the conversations was that the situation was a procedural thing, 
i.e.
, a dispute between Geneva and the Exchange due to animosity between parties at each organization, rather than an actual problem, and that Geneva would remedy the situation and expected to begin writing new business in the near future.  Specifically, Brotsos and Prestipino gave Larson the impression that the "sky [wa]s not falling down," nor was it a "panic-oh-my-God-we-have-no-money kind of thing" and there was no "viable reason *** to take any action."  Larson stated that Brotsos and Prestipino's responses "allayed [his] *** apprehension to the point where [he] bought into it."  Larson further testified that Child, and Jelilian, who had heard the conversations, along with Freyer, later conferred and decided to leave the insurance where it was even though Tunick was "pushing heavy to get the account."

Brotsos testified that he was fired from Geneva on May 15, 1995, and, prior to that time, he was not aware of any financial problems Geneva was having.  However, when he was fired, he was told Geneva was scaling back because of problems with the Exchange.  Brotsos denied he was privy to any of Geneva's financial information, except that he did remember Geneva stopped writing insurance in May.  Brotsos did not remember Larson sending him a copy of the press release and did not recall discussing the situation with either Larson or Prestipino.  Thereafter, however, Brotsos stated he did discuss the matter with Larson, but simply told him he had been fired.  Brotsos then testified that he may have told Larson that Geneva had temporarily stopped writing insurance and then stated he really did not know what he told Larson.  

Prestipino testified that he came to believe that Geneva was having some sort of financial difficulty and had ceased writing business, but did not remember when, nor how.  Prestipino then stated he believed that he discovered this information the day Brotsos called and told him he had been fired because of problems at Geneva.  Prestipino did not recall any discussions around the office regarding the need to advise the company’s clients that Geneva had ceased writing business and did not recall receiving a telephone call from Larson shortly after the May press release.  

On August 29, 1995, the Exchange issued a regulatory order due to Geneva's failure to comply with the May 9 agreement.  After reiterating its continued concerns for Geneva's economic condition, which concerns had been brought to Geneva's attention without satisfaction, the Exchange concluded that "Geneva is financially impaired to the extent that its further transaction of business is hazardous to its policyholders."  Geneva was ordered to cease and desist from writing any further insurance and to send notices of nonrenewal to all existing policyholders.
(footnote: 3)  The Exchange also recommended that the Illinois Department of Insurance (Department) take immediate steps to place Geneva in conservation.  On May 17, 1996, the Department filed a complaint for conservation of assets against Geneva.  On July 11, an agreed order of liquidation was entered.

Other extensive evidence was offered with respect to Geneva's financial condition and the Exchange's investigation of it, including the testimony of Gary Hackley, vice president of the regulatory compliance committee for the Exchange, Gerald Murray, vice president, general counsel and corporate secretary for the Exchange, and James Skeleton, president and chief executive officer for the Exchange.  Although the testimony of the witnesses was lengthy and detailed, it is only summarized here.  In addition, voluminous documents, mostly the Exchange's meeting minutes dated as early as November 10, 1993, were also presented.  These minutes detailed the concerns the Exchange had with Geneva's financial condition and efforts taken to cure the situation.

Hackley testified that, prior to 1995, issues with respect to Geneva's financial condition had been brought to his attention that raised concerns regarding the liquidity of its assets, which concerns were discussed with the entire Exchange board.  Hackley further stated that, while he attempted to keep the information confidential, because the surplus lines business was a small community and had a tremendous street network, the issues and concerns about Geneva were discussed outside of the board's meetings and among syndicate owners and Exchange brokers.

Murray testified that for a good year preceding Geneva's insolvency, the Exchange, its officers, and board members were very concerned about Geneva's asset base.  According to Murray, as of late 1994 and early 1995, "[t]here were numerous, numerous meetings involving the Geneva financial situation."  Murray stated that Geneva's financial condition continued to deteriorate, and the more the Exchange looked into its finances, "we discovered more and more very disturbing aspects."  Skeleton confirmed that, as of early 1985, the Exchange had concerns with respect to Geneva's financial condition.  

Evidence was also presented with respect to information Exchange brokers received or, were privy to, that other brokers were not.  Again, this evidence is only summarized.  Hackley testified that Exchange brokers were allowed to sit in on board meetings, as long as they were not executive sessions, and that brokers could request financial information about a syndicate from the Exchange.  Murray testified that press releases were mailed to the press, media, and other individuals on the Exchange's mailing list.  He further stated that notices and decisions with respect to Geneva were disseminated to Exchange syndicates and brokers.  As to meeting minutes, Murray did not know if Exchange brokers generally received them, but stated if a broker asked for them, they would be provided. 

Lawrence Molloy, previously an Exchange broker, underwriting manager, and syndicate principal, testified that Exchange brokers received copies of the Exchange press releases, regulatory orders, and certain other financial information.  Molloy further testified that Fred Pearson, Avreco's owner and president, probably had more access to information because of his involvement with the Exchange as a syndicate representative.  Pearson acknowledged that Exchange brokers received more information than other brokers.  Prestipino stated that he did not know if Exchange brokers had greater knowledge or access to information about syndicates than non-Exchange brokers.  However, he admitted that Exchange brokers had access to press releases, meeting minutes, and memoranda from the Exchange.  Patricia Baggot, another wholesale broker with Avreco, stated that she believed Exchange brokers had greater access to information about syndicates.  In this regard, she admitted that she had called the Exchange at times to request financial information about a syndicate and had seen Exchange memoranda, press releases, and financial audits and statements.  Additionally, in its answers to requests to admit, Avreco admitted that it received communications and documents from the Exchange, between 1992 and 1996, including documents that were not generally available to others, based on its status as an Exchange broker.  Specifically, Avreco admitted that it had greater access to information.

Conversely, Larson testified that Gremesco had no access to Exchange press releases, agendas, meeting minutes, and did not receive information from it with respect to the financial health of its syndicates.  However, it was Larson's belief that Exchange brokers did receive such information and/or had access to it.  

Various witnesses testified regarding their beliefs as to what a broker's duties entailed, particularly a wholesale broker, which testimony is again only summarized.  In addition, quite extensive testimony was given regarding how to investigate and monitor a carrier's financial condition, which testimony is omitted.  With respect to brokers' duties, Hackley testified that it was his "understanding a surplus line broker has a responsibility to know the financial security of the market where he places the business."  Similarly, Larson testified, based on his experience in the industry, that "[a] retail broker has an obligation to their customer, an insured," including the duty to provide significant information that could affect the viability of the coverage.  It was his further belief that Avreco would have a duty to Gremesco to provide such information.  In this regard, Larson testified, based on his experience in the industry, particularly working with Exchange brokers, that he came "to rely on Exchange brokers to inform [him] of information that was in their possession or control that could lead [him] to believe that an insurer is in financial trouble[.]"  Larson further stated that the duties of a broker did not cease once the effective date of the policy began.  According to Larson, if Avreco learned of material information on May 15 or May 30, after the policy was procured, it had a responsibility to advise Gremesco of it and Gremesco in turn had a responsibility to pass that information on to its customer.

Molloy also testified that, in his opinion, "part of my job [as an Exchange broker was] to know something about the financial condition of any insurer that I place my clients with."  With respect to what he would do if he discovered some sort of financial problem with a carrier while a policy was still in effect, Molloy stated, "if midterm I found out that a carrier was in trouble, I would--if I was aware that I had policyholders with that carrier, I would inform the client."  Lastly, AYH presented the affidavit of Jay Frank, as an expert, as to his opinions regarding what a wholesale broker's duties were.

Conversely, Pearson testified that there was no "official definition in any state of the union, including Illinois," requiring an individual Exchange broker or a brokerage firm to pass on to its clients information that could affect the financial health or claims paying ability of an insurer with which the company was potentially working.  Interestingly, Pearson considered both the retail brokers and the policyholders to be Avreco's clients.  Likewise, Prestipino did not consider it part of his job, before recommending a carrier to a client, to do a background investigation of that carrier.  Prestipino further testified that it was not his responsibility, after coverage had been placed, to discuss financial problems with a retail broker.  Specifically, Prestipino did not believe that it was part of his duties as a broker to pass along information affecting any potential claims or the financial capabilities of a carrier to pay any claims, particularly after a policy was issued.  Unlike Pearson, Prestipino considered only the retail broker to be his client.  Baggot, like Prestipino, testified that, in her opinion, she, as a wholesale broker, did not have a duty to advise a client of a carrier’s financial difficulty.  According to her, this was the retail broker’s job.  Baggot also testified that, when originally placing insurance, if she discovered something with respect to a carrier that would affect its financial health or claims paying ability, she would pass that information on to the retail broker.  However, if she learned information that would cause her to question the financial health of a carrier after a policy had been placed, like 15 or 30 days, it was not her duty to pass this information on to a retail broker.  Baggot, however, then stated she did not know if she had a duty to convey such information or not.  

Evidence was also presented with respect to Avreco's knowledge of Geneva's financial condition, its investigation or ability to obtain same, and information that was imparted to its clients.  
Hackley testified that he had discussions with Pearson regarding Geneva's financial problems.  According to Hackley, Pearson was aware of street talk and would call Hackley and ask him what was going on with the Exchange. 

Pearson admitted that ATLA Mutual, another one of its clients, was advised in 1994 as to problems with Geneva and its ability to qualify as an eligible reinsurer.  Pearson spoke to both Peter Wood and Robert Coleman of ATLA and recommended they replace their renewal coverage with someone other than Geneva.  Pearson further admitted that in May 1995 he had a conversation with Jeffrey Wood, Geneva's owner, and specifically remembered discussing the future of Geneva because the Exchange was "breathing on it."  Pearson testified that the only conversations he remembered hearing or having around the office at this time was whether Avreco would continue doing business with Geneva.  Pearson further admitted that he knew Richard Foss, Geneva's president and an underwriter, and knew he was involved with a couple of carriers that became insolvent. 

Prestipino also admitted he was aware that Foss had been involved with two other insurance companies that had severe financial problems and eventually became insolvent and that Foss was now affiliated with Geneva.  Prestipino further admitted that he was aware that ATLA had attempted to place its insurance coverage elsewhere, but stated he did not know why.  Prestipino denied having any discussions with Larson in 1995 in connection with the financial health of Geneva.  With respect to the August 29 regulatory order, Prestipino denied seeing this document until recently.  He further denied being aware that Geneva was in bad financial situation.  Specifically, Prestipino denied knowing between 1994 and 1996 that Geneva was having financial problems and stated he only learned of same when Brotsos was fired (this was May 1995).

Molloy testified that, due to prior knowledge he possessed with respect to Geneva's owner, president, and financial history, he did not place insurance with Geneva.  Molloy further testified that he was aware of the controversies with Geneva, all of which was generally subjects of the board’s meetings.  Although Molloy stated some of the discussions were held in executive sessions, which were supposed to remain confidential, the substance of most of the executive sessions were nonetheless brought out at full board meetings.  

Molloy further testified that in October 1994, he received a call from Baggot in which she asked him to increase his treaty reinsurance for ATLA.  When he asked her why, "she got a little quiet" and responded, " 'Well, we have to replace somebody.' "  When Molloy inquired who, Baggot stated that it was Geneva.  When Molloy asked why, Baggot responded, " 'They don't meet the requirements of our solvency committee'--or 'our security committee' was the term she used."  According to Molloy, he was curious as to what had happened to make Avreco suddenly not want to do business with Geneva and when he stated, "Really," Baggot replied that Avreco "needed to replace them because they didn't think they were going to be around to pay their claims."  Molloy further testified that he talked at length with Baggot in connection with her concerns about Geneva.  According to him, her statements confirmed his preexisting understanding that Geneva was in financial difficulty and that Avreco was aware of same.

Baggot testified that she wrote various memos to ATLA with respect to its reinsurance policy with Geneva.  According to Baggot, she provided this client with more information because it was not "insurance-savvy" and, therefore, she treated it more like an insured.  Baggot did not remember advising ATLA in the spring of 1994 to reject a renewal from Geneva.  With respect to her August 30, 1994, letter to Robert Coleman, who had requested information from Pearson, Baggot admitted that she advised ATLA about Geneva's claim payment delays.  Baggot further stated that there came a time when she learned Geneva was experiencing financial difficulties, but she did not recall when this was.  According to her, she was only given information that Geneva could no longer write business because of financial problems.  Baggot then admitted, though, that before Geneva stopped writing insurance, she was aware of the Exchange’s efforts to place it under supervision based on discussions within the office.  She also heard some discussions about questionable transactions going on in the company.  Baggot also admitted that she passed on information from the Exchange to ATLA about Geneva because it was a difficult client.

With respect to discussions with Molloy, Baggot stated that she placed business for ATLA with Molloy in the summer of 1994, but did not recall calling him in October asking him to increase his participation as a treaty reinsurer, nor did she recall any attempt to replace Geneva.  Baggot further did not recall ever telling Molloy that Geneva might not meet Avreco’s security committee’s requirements.  According to Baggot, Molloy made up this entire conversation.  Thereafter, however, Baggot admitted having two conversations with Molloy, but stated that it was nothing like Molloy testified to.  Baggot further denied ever telling Molloy that Geneva was in trouble.  Again, in its answers to requests to admit, Avreco admitted that it was aware of investigations into Geneva's financial condition as of May 10, 1995, and that it was experiencing financial difficulties by virtue of the press release and other notices it had received.

With respect to AYH's knowledge of Geneva's financial condition, Freyer testified that, other than the lack of a Best rating, he was not aware of any problems with Geneva, nor was he ever told of any investigations of the company.  Larson testified that Avreco never told him anything that would lead him to conclude that AYH's coverage was in jeopardy.  Specifically, Larson testified that if Avreco was in possession of information, either by virtue of its status as an Exchange broker or any other means, that Geneva was in trouble, he would have expected Avreco to pass that information on to him and he, in turn, would have passed it on to his client, but Avreco never did so.  Larson identified 13 specific items of information of which he would have liked to have been apprised.  Larson also testified that he was never advised of the Exchange's August 29 regulatory order, although it was something he would have expected Avreco to tell him about, which he would have passed on to his customer. 

On March 6, 2003, the trial court denied Gremesco's motion for summary judgment with respect to AYH's claims based on breach of fiduciary duty and professional negligence.  However, it granted Gremesco's motion for summary judgment with respect to breach of contract.  The trial court deferred ruling on Avreco's motion and directed the parties to submit additional briefs with respect to duties owed by Avreco.  On March 11, AYH filed its supplemental brief on Avreco's duties.  On March 17, Avreco filed its surreply brief in support of its motion for summary judgment.  According to this brief, at oral argument on the motions for summary judgment, the court asked the parties to address the issue of whether Avreco, "which was asked to perform a limited, non-discretionary task by Gremesco--namely, binding an insurance policy that Gremesco had already negotiated directly with Geneva and that American Yacht had decided to accept after considering it and another option presented by another insurance broker--owed any duties to American Yacht that could serve as the basis for either a negligence or fiduciary duty claim."
(footnote: 4)  The court further asked the parties to address the line of cases involving "patient/doctor/pharmacist relationship," which it found pertinent to the issue of whether a duty existed in the instant case.
(footnote: 5)   Additionally, according to this brief, at oral argument, the court found that, based on the undisputed facts, Gremesco retained Avreco solely to perform the ministerial task of binding a renewal policy that had already been negotiated.

On May 28, the trial court entered an order granting Avreco's motion for summary judgment and dismissed AYH's complaint against Avreco.  According to the court's order, the record demonstrated that Avreco, at Gremesco's request, bound the renewal policy.  It was the court's opinion that the placement of this policy was a nondiscretionary act and performed as an accommodation to Gremesco after Gremesco had directly negotiated with Geneva.  Accordingly, the court concluded that Avreco did not breach any fiduciary duty or professional obligation by placing the coverage as directed.  

On June 16, Avreco filed a motion for summary judgment on Gremesco's cross-claim.  Thereafter, AYH and Gremesco filed briefs in opposition to this motion and Avreco replied.  On October 15, the trial court granted Avreco's motion for summary judgment on all counts of AYH's complaint and dismissed Gremesco's cross-claim against Avreco with prejudice.  On November 3, Gremesco filed a motion to reconsider, which the trial court denied on November 24.  The trial court, in its order, included Supreme Court Rule 304(a) language.  On December 16, AYH filed its notice of appeal and, on December 22, Gremesco filed its notice of appeal.  On February 23, 2004, the trial court entered an order staying AYH's claim against Gremesco, pending further order of the court.

ANALYSIS

A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue as to any material fact exists and, therefore, the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2--1005(c) (West 1998); 
Cramer v. Insurance Exchange Agency
, 174 Ill. 2d 513, 530, 675 N.E.2d 897 (1996).  The purpose of summary judgment is determine whether a fact question exists, not to try a question of fact.  
Starr v. Gay
, 354 Ill. App. 3d 610, ___, 822 N.E.2d 89, 92 (2004); 
Gilbert v. Sycamore Municipal Hospital
, 156 Ill. 2d 511, 517, 622 N.E.2d 788 (1993).  The trial court cannot make credibility determinations or weigh the evidence at the summary judgment stage.  
Pietruszynski v. McClier Corp.
, 338 Ill. App. 3d 58, 67-68, 788 N.E.2d 82 (2003).  Although summary judgment is an efficient and useful aid in the expeditious disposition of a lawsuit, "it is also a drastic measure, and therefore, should only be employed when the right of the moving party is clear and free from doubt."  
Starr
, 822 N.E.2d at 92.  "When considering a motion for summary judgment, a court must construe the evidence strictly against the movant and liberally in favor of the nonmoving party."  
Carollo v. Al Warren Oil Co.
, ___ Ill. App. 3d ___, ___, 820 N.E.2d 994, 999 (2004).  "Where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment is properly denied and the issue is decided by the trier of fact."  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 114, 649 N.E.2d 1323 (1995); 
Mikulecky v. Bart
, No. 1-03-0378, slip op. at 7 (December 10, 2004). "An order granting summary judgment should be reversed if the evidence shows that a genuine issue of material fact exists or if the judgment was incorrect as a matter of law."  
Carollo
, 820 N.E.2d at 999.  We review the trial court's granting of a motion for summary judgment 
de novo
.  
McNamee v. State of Illinois
, 173 Ill. 2d 433, 438, 672 N.E.2d 1159 (1996).  

I.  AYH v. Avreco

The issues raised in this appeal regarding a duty owed by a wholesale insurance broker, if any, and the scope of that duty are all questions of first impression in Illinois.

A.  Duty Owed

AYH first contends that the trial court erred in granting summary judgment on its fiduciary duty and professional negligence claims in favor of Avreco because Avreco owed it fiduciary and professional duties.  Gremesco contends that the trial court erred in holding, as a matter of law, that Avreco owed no duty to inform AYH or Gremesco of Geneva's financial condition, of which it knew and, thus, erred in granting summary judgment in favor of Avreco because Avreco's superior knowledge created a duty on its part to impart the information of which it was aware.  Avreco contends that the trial court properly granted summary judgment in its favor because it was only hired for the nondiscretionary task of binding an insurance policy with Geneva, a task it fulfilled, and, therefore, there can be no breach of any duty.

Initially, we note that the parties and trial court mass together the separate questions of duty--professional and fiduciary--hindering review because it is difficult to ascertain which of the parties' arguments relate to a theory of negligence and which relate to a theory of fiduciary duty.  Additionally, most of the arguments are directed toward breach, rather than whether a duty exists.  However, the imposition of a duty under a theory of negligence is different than the imposition of a fiduciary duty because the rationale underlying both result from different principles.  The basis for a duty under a negligence theory is foreseeability, whereas the basis for a fiduciary duty, in the situation here, is an agency relationship.  While the nature and scope of the duties may ultimately overlap, the initial question of whether Avreco owed a duty under either theory does not.

An insurance producer, 
i.e.
, an insurance broker, may be liable for losses sustained by an insured when a carrier fails to perform as promised, 
e.g.
, if the carrier becomes insolvent.  B. Christensen, 
Carrier Failure: Liability of Agent is at Issue
, National Law Journal 25, at 25 (November 18, 1991).  The theories under which a broker may be liable are: breach of contract, negligence, breach of fiduciary duty, and fraud.  National Law Journal at 25.

To state a claim for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary duty on the part of the defendant; (2) the defendant's breach of that duty; and (3) damages that were proximately caused by the defendant's breach.  
Neade v. Portes
, 193 Ill. 2d 433, 444, 739 N.E.2d 496 (2000).  In the instant case, a fiduciary duty would result from a finding that an agency relationship existed between AYH and Avreco.  Specifically, "[t]he relationship between an insured and his broker, acting as the insured's agent, is a fiduciary one."  
Perelman v. Fisher
, 298 Ill. App. 3d 1007, 1011, 700 N.E.2d 189 (1998). "[I]f the principal suffers damage due to any mistake or *** omission of the agent which constitutes a breach of duty to the principal, the agent is liable to the principal for any loss sustained thereby."  
Perelman
, 298 Ill. App. 3d at 1012.  While the "existence of a duty, a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another, is a matter of law to be decided by the trial court" (
Kanter v. Deitelbaum
, 271 Ill. App. 3d 750, 753-54, 648 N.E.2d 1137 (1995)), the existence and scope of an agency relationship is a question of fact (
Ervin v. Nokia, Inc.
, 349 Ill. App. 3d 508, 512, 812 N.E.2d 534 (2004)). 

Conversely, "[t]he essential elements of a cause of action based on common law negligence are the existence of a duty owed by the defendant to the plaintiff, breach of that duty, and an injury proximately caused by that breach. [Citation.]" 
Clifford v. Wharton Business Group, L.L.C.
, 353 Ill. App. 3d 34, 40, 817 N.E.2d 1207 (2004).  In general, 

"a duty of care arises where the parties stand in such a relationship to one another that the law imposes upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. [Citation.]  Whether a defendant owes a plaintiff a duty of care is usually a question of law to be decided by the court. [Citation.]  In making this determination, the court is to consider the following factors: (1) the foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden on the defendant of guarding against the injury; and (4) the consequences of placing the burden on the defendant."  
Clifford
, 353 Ill. App. 3d at 40.  

1.  Fiduciary Duty/Agency

The first question here is whether Avreco was acting as an agent for AYH.  If it was not, there can be no fiduciary duty.  AYH maintains that Avreco was a subagent for Gremesco and, therefore, owed the same duties to it as Gremesco did.  Avreco maintains that a subagent theory is irrelevant because it was not asked to perform the same duties delegated to Gremesco.  Specifically, according to Avreco, Gremesco was hired to perform more duties and it did not delegate them to Avreco.
(footnote: 6)  Rather, Avreco argues that it performed a minimal, nondiscretionary task and simply was a funnel for the ministerial task of placing the insurance.  

Although our review is 
de novo
 and, thus, the trial court's rationale is irrelevant, we note there is no evidence that it analyzed the issue of subagency as is necessary.  If an agent is so authorized, it may appoint subagents to perform those tasks or functions the agent has undertaken to perform for the principal.  
Petersen v. United States Reduction Co.
, 267 Ill. App. 3d 775, 784, 641 N.E.2d 845 (1994). 
 A subagent is "an agent appointed by one who is himself an agent.  A person appointed by an agent to perform some duty, or the whole of the business, relating to his agency.  A person employed by an agent to assist him in transacting the affairs of his principal."  Black's Law Dictionary 1277 (5th ed. 1979).  "The subagent stands in a fiduciary relationship to the principal and is subject to the same liabilities as an agent."  
Passarello v. Lexington Insurance Co.
, 740 F. Supp. 933, 936 (D. Conn. 1990).   Specifically, "[a]n agency relationship exists between the principal and an authorized subagent, and, under the Restatement Second of Agency, *** a subagent who knows of the existence of the ultimate principal owes him the duties owed by an agent to a principal."  3 Am. Jur. 2d 
Agency
, §163, at 561 (2002).  Although an agent generally cannot " 'properly delegate to another the exercise of discretion in the use of a power held for the benefit of a principal,' [citation]," the " 'authority to conduct a transaction ... includes authority to delegate to a subagent the performance of incidental mechanical and ministerial acts.'  Restatement (Second) of Agency §78."  
United States of America v. Mendoza-Acuna
, 764 F.2d 699, 702 (9th Cir. 1985). 

The above principles apply in insurance settings as well.  Specifically, " '[f]ull power to procure *** insurance for another includes whatever is reasonably incidental thereto ... [including] the power to engage subagents or to delegate authority.' [Citation.]"  
Passarello
, 740 F. Supp. at 936.  See also 7 Holmes' Appleman on Insurance 2d, §44.2, at 17 (2000).  "[T]he most usual summons of another broker occurs in the so-called excess or surplus lines business."  13 Holmes' Appleman Insurance 2d, §101.1, at 953.  In this industry, the insured often does not know about the existence of the wholesaler, or its role, nor the fact that several other brokers may be involved in the process of obtaining insurance for it.  However, "[t]his chain is often necessary in piecing together groups of companies needed to cover large or complicated risks."  13 Holmes' Appleman Insurance 2d, §101.1, at 955.  "Where the wholesale broker is selected with the consent of the insured, the wholesale broker may be liable to the insured as the insured's own sub-agent."  13 Holmes' Appleman Insurance 2d, §101.1, at 965.   Whether a subagency exists has generally been found to be a question of fact based on the particular circumstances of the case and, accordingly, improperly determined on summary judgment.  See 
Legros v. Great American Insurance Co. of New York
, 865 So. 2d 792, 795 (La. App. 2003); 
Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety
, 71 F. Supp. 2d 394, 400 (D. N.J. 1999); 
Chandler v. H.E. Yerkes & Associates, Inc.
, 784 F. Supp. 119, 124 (S.D. N.Y. 1992) (all holding that the question of whether a wholesale broker was a subagent was a question of fact that cannot be determined on summary judgment).  

There are no Illinois cases on this issue.  However, several cases from other jurisdictions are instructive.  In 
United Capitol Insurance Co. v. Kapiloff
, 155 F.3d 488 (4th Cir. 1998), the Kapiloffs contacted their insurance agent, Ray Miller of J.L. Hickman & Co, Inc., t/a IFA Insurance Services (IFA,) to arrange commercial property insurance for them.  
Kapiloff
, 155 F.3d at 491.  IFA submitted the Kapiloffs’ application to Horan Goldman & Company, a wholesale surplus lines broker.  Horan Goldman obtained a policy of insurance from United Capitol Insurance Company.  
Kapiloff
, 155 F.3d at 491.  After the Kapiloffs sustained damages and United Capitol refused to pay their claims, United Capitol filed an action seeking a declaration that it had no liability for the claims.  
Kapiloff
, 155 F.3d at 492.  The Kapiloffs responded with a lawsuit against the brokers, 
inter alia
, alleging that they were negligent in procuring the insurance.  
Kapiloff
, 155 F.3d at 492.  The district court granted summary judgment in favor of Horan Goldman, finding that it was not an agent of the Kapiloffs and therefore owed them no duty.  
Kapiloff
, 155 F.3d at 498.  

In reversing the district court's grant of summary judgment, the 
Kapiloff
 court noted that the district court had "failed to recognize the role served by Horan Goldman in placing insurance with United Capitol on behalf of the Kapiloffs."  
Kapiloff
, 155 F.3d at 498.  Specifically, the evidence showed that it was Horan Goldman who identified United Capitol as a suitable insurer and who placed the insurance with it.  In addition, the Kapiloffs listed Horan Goldman as their agent on their proof of losses.  
Kapiloff
, 155 F.3d at 498.  Although Horan Goldman had never communicated directly with the Kapiloffs, the court did not find this fatal to a finding of agency, stating that "[w]hat is critical is whether Horan Goldman knew of the Kapiloffs and acted on their behalf at the request of IFA."  
Kapiloff
, 155 F.3d at 498, citing Restatement (Second) of Agency §428(1) and 5(1).  

The court further rejected Horan Goldman’s argument that it acted simply as a middleman between the insured and the insurer, finding that "that fact does not refute the general principle that just such a relationship can be an agency relationship."  
Kapiloff
, 155 F.3d at 498.  In reaching its determination that a fact question existed, the court found that the evidence showed that IFA engaged Horan Goldman with the knowledge of the Kapiloffs, Horan Goldman relayed information about the Kapiloffs to United Capitol and applied for insurance in their names, the IFA broker testified that he understood Horan Goldman to be acting under a similar duty of care to the Kapiloffs as he was, and the Kapiloffs recognized Horan Goldman as their agent as evidenced by their proof of loss forms.  
Kapiloff
, 155 F.3d at 498.  The court concluded, making all reasonable inferences from the evidence in favor of the Kapiloffs, that "it [was] reasonable to infer that the Kapiloffs had some measure of control over Horan Goldman’s actions through [their extensive contact with] IFA" (
Kapiloff
, 155 F.3d at 498), "[i]t [was] also reasonable to infer that Horan Goldman was acting primarily in the Kapiloffs' benefit" as he helped them procure the insurance, and it was reasonable to conclude that Horan Goldman was empowered to bind the Kapiloffs since it submitted an application to United Capitol and ultimately bound the policy (
Kapiloff
, 155 F.3d at 499).  Accordingly, the court reversed the district court’s dismissal of Horan Goldman from the action and remanded the cause "to allow a factfinder to decide whether the insurance that Horan Goldman procured was undertaken pursuant to its duty as the Kapiloffs’ agent or subagent."  
Kapiloff
, 155 F.3d at 499. 

In another case, on review of the grant of summary judgment, a 1990 Connecticut federal district court found that the evidence established that a wholesale broker was in fact a subagent of the insured.  In 
Passarello
, Passarello hired Fred S. James & Co. (James) to procure property insurance.  
Passarello
, 740 F. Supp. at 934.  In turn, James contacted Alexander Howden N.A., Inc. (AHNA), a wholesale insurance broker, who acted as an intermediary between James and Lexington Insurance Company, the company that ultimately provided insurance to Passarello.  
Passarello
, 740 F. Supp. at 934.  When Passarello filed a lawsuit against the carrier and brokers after sustaining certain losses, AHNA moved for summary judgment on the basis that it owed no duty to Passarello because it did not act as Passarello's broker; rather it dealt exclusively with the retailer broker, James.  
Passarello
, 740 F. Supp. at 935.  The court found that "having received an order from James to procure insurance for plaintiff, AHNA acted as plaintiff's subagent."  
Passarello
, 740 F. Supp. at 935.  Specifically, the court concluded that both brokers, James and AHNA, were agents of Passarello, acting as the middlemen between him and Lexington.  Accordingly, the 
Passarello
 court found that both owed duties to the plaintiff.
(footnote: 7) 

Conversely, in 
In re Highway Equipment Co.
, 153 B.R. 186 (1993), the court found that a wholesale broker was not a subagent of the insured.  In 
In re Highway Equipment Co.
, the insured attempted to hold several brokers liable after the carrier the insured had been placed with refused to pay its claims.  The facts of this case, particularly the various parties involved, are complicated, but in essence, the insured contacted one company, who in turn contacted at least one other company.  Loveless, a wholesale broker, was subsequently contacted and it ultimately contacted Howden, another wholesale broker.  Although the insured argued that Howden had breached its duty to it based on an agency relationship, the court disagreed.  
In re Highway Equipment Co.
, 153 B.R. at 192.  The court first noted that, if Loveless was an agent of the insured, then Holden may well be a subagent.  However, the court concluded that the evidence clearly demonstrated that Loveless was not an agent of the insured and, therefore, Howden could not be a subagent.  
In re Highway Equipment Co.
, 153 B.R. at 193.

We find these cases persuasive and instructive on the issue of wholesale brokers, subagency, and summary judgment.  Again, in the instant case, there is no evidence the trial court analyzed the issue of subagency.  However, based on a review of the facts liberally in favor of AYH, we find that a genuine issue of material fact existed as to whether Avreco was acting as a subagent when it procured the renewal insurance on AYH's behalf, thereby precluding summary judgment.  First, Gremesco clearly was an agent of AYH's and had authority to appoint a subagent.  In fact, Gremesco was required to retain an Exchange agent to procure the insurance from Geneva.  215 ILCS 5/107.05(b) (West 2000) ("Only Exchange brokers may present insurance business to the Exchange").  Moreover, the evidence demonstrates that AYH was aware of Avreco and its efforts to procure insurance on its behalf.  Likewise, Avreco had knowledge of AYH.  The fact that there were no direct communications between Avreco and AYH is not fatal to a finding of an agency relationship because Avreco was aware of AYH and acted on its behalf.  
Kapiloff
, 155 F.3d at 498.  Information regarding AYH was relayed to Avreco, Avreco applied for insurance in AYH's name, and Avreco was empowered to legally bind AYH and, in fact, did so.  As to merely being a "middleman," the court in 
Kapiloff
 rejected the same argument, finding that even though one is merely a middleman, there can still be an agency relationship.  This conclusion is sound.

With respect to Avreco's argument that it simply performed a ministerial task, agents are empowered to delegate ministerial and mechanical tasks to subagents.  Restatement (Second) of Agency §78; 
Mendoza-Acuna
, 764 F.2d at 702.  This is precisely what Gremesco did.  Moreover, there was evidence, from which it may be inferred, that Avreco did more than simply bind the policy--it may actually have undertaken some sort of negotiations or modification of the original deal.  Although there was evidence that Larson and Brostos negotiated the terms and cost of the renewal, there also was evidence of a competitive quote that may have impacted upon or restructured those negotiations.  In this regard, Larson wrote to Prestipino on March 13, stating that he may need to impress upon Brotsos the need to be flexible as to pricing and structure of the renewal.  The inference to be drawn from this is that Prestipino may need to undertake additional negotiations with Brotsos.  Prior to this letter, plaintiff sought a primary policy of insurance from Geneva.  However, the policy it was ultimately issued was an excess policy.  Additionally, Larson wrote that he needed Brotsos to come in around $100,000 (for the total premium presumably).  This would indicate that the premium had not yet been fully negotiated or, at least, not yet been set in stone as Avreco wants this court to believe. Plaintiff ultimately paid $50,000 in premiums for the excess policy to Geneva.  Lastly, and most importantly, Pearson, the owner of Avreco, testified that he considered both the retail brokers and the 
policyholders
 to be Avreco's clients.  If this is true, by Pearson's own testimony, Avreco would be considered a subagent.  

We therefore find that there was sufficient evidence to create a genuine issue of material fact as to whether Avreco was a subagent of AYH's, thereby precluding summary judgment.

2. Negligence 

AYH next contends that Avreco breached its duty of professional care.  Again, there is nothing in the record to show that the trial court analyzed whether a duty existed under the relevant factors identified above.  In their briefs, only Gremesco does so under a superior knowledge theory.  AYH does argue that its expert established a duty owed by Avreco and what those duties were, which testimony the trial court failed to take into consideration.  However, AYH also does not analyze the factors identified above.  Avreco contends that the trial court, in the first instance, must determine whether a duty existed and what that duty was and, here, AYH attempted to usurp that role through its expert’s opinion.

Gremesco contends that Avreco's superior knowledge of information about Geneva's financial condition, which was established by ample evidence, created a duty on its part to impart such information to AYH or Gremesco.  With respect to the superior knowledge doctrine, Avreco argues that this theory is a red herring.  According to Avreco, it is not a question of who has the most knowledge, but a question of who has the most knowledge about the insured and its need, of which Avreco had no such information.   Initially, we note that while the parties refer to the learned intermediary doctrine, we find no reason to apply it here.  First, the parties have cited no authority that this doctrine, relative to physicians/patients, applies to insurance brokers and our independent research has disclosed none.  Second, the learned intermediary doctrine is a special rule created based on the doctor-patient relationship, where the doctor is in the best position to warn the patient.  The doctrine is further based on the rationale that a duty should not be imposed upon pharmacists to learn their customer's medical condition and monitor their drug use, thereby forcing pharmacists to practice medicine without a license.  
Happel v. Wal-Mart Stores, Inc.
, 199 Ill. 2d 179, 189-95, 766 N.E.2d 1118 (2002).

However, a duty to inform of material information may be applicable, as argued by Gremesco.  In this regard, Gremesco relies upon 
Happel
, arguing that it is factually similar to the case here because there was evidence that Avreco actually knew about Geneva's unsound financial condition and passed it on to other larger clients, 
e.g.
, ATLA; it was reasonably foreseeable that if Avreco did not pass on the information, AYH would be exposed to claims that would not be paid if Geneva became insolvent; and the burden to disclose this information was very minimal.
(footnote: 8)  

While the facts of 
Happel
 are not analogous to the instant case since they involved a pharmacist, the general law set forth by the court is applicable.  Specifically, " ' " '[a] duty to warn exists where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given.' " ' [Citations.]" 
 Happel
, 199 Ill. 2d at 186.  In Illinois, "a particular burden" is placed "on an insurance broker to exercise competence and skill in rendering services."  
Lake County Grading Co. of Libertyville, Inc. v. Great Lakes Agency, Inc.
, 226 Ill. App. 3d 697, 703, 589 N.E.2d 1128 (1992).  In this regard, "[t]he broker must inform the insured of all material facts within the broker's knowledge that may affect the transaction or the subject matter of the relationship."  
Lake County Grading Co. of Libertyville, Inc.
, 
226 Ill. App. 3d at 703.  Thus, whether due to common knowledge or unequal knowledge, a broker in Illinois has a duty to inform an insured of material information in its possession.

Here, it is reasonably foreseeable that if Avreco failed to convey information in its possession with respect to Geneva's financial condition, at the least, to Gremesco, injury was likely to AYH.  Both the likelihood and reasonable foreseeability of injury are great.  If Geneva was financially unsound and unlikely to be able to pay claims, any losses AYH may sustain would be in jeopardy.  In addition, the burden of imposing a duty on Avreco would be minimal.  A simple telephone call or fax would suffice.  Lastly, as to the consequences of imposing such a burden, this would not be extensive on Avreco's part.  All Avreco would be required to pass along is that information in its possession, 
i.e.
, those material facts of which it had knowledge.  There was evidence to demonstrate Avreco had superior knowledge or, at the least, was privy to information unavailable to non-Exchange brokers about Geneva's financial condition and it did, in fact, provide that information to another client.  Given its status as an Exchange broker and its involvement in a specialty insurance market, we find that Avreco did have a duty under the circumstances present here.  We are not saying all brokers, or even all wholesale brokers, owe such a duty.  Rather, under the particular circumstances of this case, the evidence was sufficient to create a duty on the part of Avreco to inform AYH of the information in its possession in connection with the financial condition of Geneva.

Accordingly, we find that the trial court erred in granting summary judgment on plaintiff's professional negligence claim.

II.  Nature and Scope of Duty/Breach

AYH next contends that Avreco had a duty to monitor and assess the risk of Geneva and convey any material information to it.  In this regard, AYH argues that it presented ample evidence to demonstrate Avreco's knowledge of Geneva's unsound financial condition, which material information it failed to provide to it or Gremesco. 

Avreco maintains that it did not breach any duty owed to AYH.  According to Avreco, if a broker places insurance with a carrier that is generally considered solvent, which there was ample evidence of in connection with Geneva, the broker cannot be held liable for a breach of duty of care.
(footnote: 9)  According to Avreco, when it placed the insurance with Geneva in April 1995, Geneva was considered solvent and it was not declared insolvent until July 1996.
(footnote: 10)  Avreco further maintains that once the policy was placed with Geneva, its duty to AYH ended and, therefore, anything it learned after that with respect to Geneva’s financial condition was irrelevant. 

There is no case law in Illinois regarding a wholesale broker's duties.  However, based on the case law from other jurisdictions relative to an insurance broker's duty, specifically a wholesale broker, as well as treatises and practice guides, the general rules with respect to the nature and scope of duties imposed on a broker can be distilled as follows: 

"An agent employed to procure insurance for his principal is under a duty to exercise good faith, reasonable skill, and ordinary diligence to secure the insurance on the best terms obtainable, and if the agent is a professional agent, to exercise the particular skill reasonably to be expected of such an agent."  7 Holmes' Appleman on Insurance 2d, §44.7, at 65.  

"It is also incumbent upon a broker or agent to keep the principal *** fully and promptly informed of all material knowledge and facts possessed by him relating to the risk, or to the business entrusted to his care or done by him, which it is important that the principal should know."  7 Holmes' Appleman on Insurance 2d, §44.7, at 67.  "In the insurer insolvency context, a broker's duties can be essentially broken down into two categories: (1) the duty to investigate the financial condition of an insurance company and (2) the duty to advise the client or take other action upon gaining information that a client's coverage may be threatened due to an insurer's financial condition."  R. Ardoin and C. Carrington, 
Professional Liability Targets in Cases of Insolvency: Insurance Brokers, Agents, and Intermediaries
, 580 Practising Law Institute, PLI Order No. A4-4343, 227, 248 (May-June 1991).  "Assuming that a broker is on notice that an insurance company is insolvent, he or she has an affirmative duty to notify the client of the fact."  580 Practising Law Institute at 251.  

However, "[t]he general rule is that an insurance agent or broker is not a guarantor of the financial condition or solvency of the company from which he obtains the insurance.  He is required, however, to use reasonable skill and judgment with a view to the security or indemnity for which the insurance is sought, and a failure in that respect may render him liable to the insured for resulting losses."  
Higginbotham & Associates, Inc. v. Greer
, 738 S.W.2d 45, 46 (Tx. App. 1987).  As such, "where the company was solvent when the policy was procured, its subsequent insolvency generally does not impose liability on the agent or broker."  
Higginbotham & Associates, Inc.
, 738 S.W.2d at 46-47.  There is one exception to this rule.  A broker is not liable for an insurer's subsequent insolvency where the insurer was solvent at the time the policy was placed, "unless at that time or at a later time when the insured could be protected, the agent knows or by the exercise of reasonable diligence should know, of facts or circumstances which would put a reasonable agent on notice that the insurance presents an unreasonable risk."  
Higginbotham & Associates, Inc.
, 738 S.W.2d at 47.  See also 43 Am. Jur. 2d 
Insurance
 §169, at 217-18 (2003); 44 C.J.S. 
Insurance
 §215, at 408-10 (1993) (setting forth same rules).  Under this exception, "a broker may have a continuing duty to apprise policyholders of any adverse change in a carrier's financial condition."  43 Am. Jur. 2d 
Insurance
 §169, at 218.  In other words, "[i]f, after the insurance is placed, the broker learns that the insurance company has become insolvent, the broker has a duty to notify the insured of the insolvency."  44 C.J.S. 
Insurance
 §215, at 410.  

Surplus lines brokers have been held to a higher standard based on the nature of the insurance in which they are involved.  J. Boisseau, 
Liability of Brokers, Agents and Intermediaries in Insurer Insolvency
, 580 Practising Law Institute, PLI Order No. A4-4343 203, 210 (May-June 1991).  As such, it has been noted that "[t]he surplus lines broker is at greater risk of incurring liability for an insured's loss upon insolvency than a broker transacting business exclusively with domestic carriers."  580 Practising Law Institute at 252-53.   

This, again, is an issue of first impression in Illinois.  We find the general rules espoused above persuasive.  Extensive evidence was presented as to information Avreco had access to, particularly from the Exchange, due to its position as an Exchange broker.  There was also evidence that Avreco actually had adverse information regarding Geneva that it imparted to another client. The evidence offered by the parties, including the testimony of the witnesses, required credibility determinations and the weighing of evidence by the trial court, which is improper at the summary judgment stage.  Specifically, factual questions existed, 
inter alia
, regarding exactly what information Avreco possessed, when it came to Avreco's knowledge, and to whom Avreco imparted that information.  Viewing the evidence liberally in favor of AYH, we find that the evidence was sufficient to create a genuine issue of material fact as to whether Avreco knew when it placed the renewal policy, and at times thereafter, or should have known in the exercise of due diligence, of facts or circumstances putting it on notice that the insurance presented to AYH presented an unreasonable risk.  
Higginbotham & Associates
, 738 S.W.2d at 47.  Accordingly, we find that summary judgment was improper on the question of breach of duty based on the existence of numerous genuine issues of material fact.

III.  Statute of Limitations

Avreco contends that the trial court properly granted summary judgment in its favor because AYH’s claims are barred by the statute of limitations.  According to Avreco, the evidence shows that AYH knew of Geneva’s financial trouble and that it would not be able to pay its claims more than two years prior to May 15, 1998, when it filed its complaint.  Avreco provides at least two different dates AYH knew or should have known of same.  In its brief on appeal, Avreco argues that AYH knew prior to April 1996 based on the testimony of Michael Rodgers from Barclays.  In the trial court, in its motions to dismiss AYH's complaint, Avreco argued that AYH knew as of May 1, 1996, when AYH received a nonrenewal notice from Geneva.  

The question here is whether we can determine, as a matter of law, that the statute of limitations began to run before May 15, 1996, two years prior to the time AYH filed its complaint.  See 
Castello v. Kalis
, 352 Ill. App. 3d 736, 744, 816 N.E.2d 782 (2004).  In most instances, when a plaintiff knows or reasonably should have known of its cause of action is a disputed question of fact.  
Castello
, 352 Ill. App. 3d at 744.  "However, '[w]here it is apparent from the undisputed facts *** that only one conclusion can be drawn, the question becomes one for the court[,]' and can be resolved as a matter of law, making summary judgment on statute of limitation[s] grounds appropriate."  
Castello
, 352 Ill. App. 3d at 744.

The trial court did not address this issue.  Nonetheless, the evidence here is conflicting and could not be resolved on summary judgment.  As noted above, Avreco provides at least two different dates that AYH supposedly was aware Geneva would be unable to pay its claims.  However, additional evidence is present in the record suggesting yet another date.  On October 10, 1996, Freyer, of AYH, wrote to Rodgers stating that, based on information he had recently received, it would be over two years before AYH saw any money on its claim.  Clearly, based on the evidence in the record, one conclusion is not apparent and, therefore, summary judgment would not be appropriate on statute of limitations grounds.

IV.  Section 2-2201

Avreco next contends that AYH’s claims were expressly barred by section 2201 of the Illinois Code of Civil Procedure.  735 ILCS 5/2201 (West 2002).  Although Avreco admits that this provision became effective in 1997 and does not apply retroactively, it contends that if AYH’s cause of action accrued in 1998, as AYH maintains, then it was barred by this provision.  Conversely, if AYH’s cause of action accrued in 1996, as Avreco maintains, then it was barred by the statute of limitations.  

Section 2201(b) immunizes an insurance broker from claims based on breach of fiduciary duty.  In the instant case, whether this provision is applicable is dependent upon a resolution of when AYH's cause of action accrued.  Because we cannot determine that issue, the question of whether section 2201 bars AYH's claim for breach of fiduciary duty, too, cannot be resolved.  Accordingly, Avreco would not be entitled to summary judgment on this ground.

V.  Gremesco's Cross-Claim against Avreco

Gremesco contends that the trial court erred in granting summary judgment in favor of Avreco and against it on its cross-claim for contribution and indemnification because Avreco's knowledge was superior to its knowledge and, therefore, it was inconsistent for the trial court to grant summary judgment in favor of Avreco, but deny it in favor of Gremesco.  AYH also contends that the trial court erred in granting summary judgment in favor of Avreco on Gremesco's cross-claim based on its erroneous conclusion that Avreco owed no duty to AYH.

Avreco contends that the trial court did not err in granting summary judgment in its favor on Gremesco's cross-claim because it was not liable to Gremesco under contribution since it is not a tortfeasor 
vis-a-vis
 AYH.  Similarly, Avreco contends that it was not liable to Gremesco under an indemnity theory because Gremesco is not a blameless party, the only situation under which indemnity applies, as the trial court specifically determined that Avreco had no role in placing the policy and, thus, it was impossible for Gremesco’s liability to be a result of Avreco’s conduct.

Because Gremesco's claims against Avreco are dependent upon AYH's claims against Avreco and we have found that the trial court erred in granting summary judgment in favor of Avreco against AYH, we also conclude that it was error to grant summary judgment in favor of Avreco against Gremesco.  We make no judgment on the merits of Gremesco's claims; we simply find that summary judgment was improperly granted as a matter of law.

CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court of Cook County and remand this cause for further proceedings.

Reversed and remanded.

HALL and GARCIA, JJ., concur.

FOOTNOTES
1:
AYH entered voluntary bankruptcy in May 1996 and AYH Holdings succeeded in interest to American Yacht.  Both are referred to as AYH here.

2:
In this motion, as in its brief on appeal, Avreco included numerous footnotes in which it made substantive arguments and substantively addressed case law.  Substantive arguments may not be made in footnotes.  
Lundy v. Farmers Group, Inc
., 322 Ill. App. 3d 214, 218, 750 N.E.2d 314 (2001).

3:
Although there are numerous nonrenewal notices contained in the record, there is none for AYH.

4:
The report of proceedings on the motions for summary judgment are not contained in the record on appeal.

5:
This is quoted from Avreco's surreply brief in support of its motion for summary judgment.

6:
Avreco distinguishes the cases relied upon by AYH and substantively discusses other cases in footnotes.  We do not consider these arguments because they are improperly made in a footnote.

7:
AHNA further argued that even if it was considered an agent of the plaintiff, it was not negligent because it had no contact with the plaintiff and did exactly what James asked it to do; it placed the policy.  The court concluded that the plaintiff had presented sufficient evidence to establish a question of fact as to whether AHNA fulfilled its duties.  
Passarello
, 740 F. Supp. at 936.

8:
Avreco distinguishes 
Happel
 in a footnote and, therefore, we do not consider its argument.

9:
In support of this argument, Avreco relies on an Illinois Supreme Court case decided in 1873.  This case has only been cited three times by the Illinois Appellate Court, in 1878, 1894 and 1970.  Its value is therefore questionable.

10:
In support of this argument, Avreco cites a 1979 California case and a 1998 
unreported
 federal appellate court case.  We do not consider either.